## THE MARLBOROUGH.

### BURSLEY v. THE MARLBOROUGH et al.

*(District Court, E. D. Pennsylvania. June 30, 1891.)*

**1. SHIPPING—SEAWORTHY VESSEL.**
A vessel built in 1877, kept in good repair, and rated, when she started on her voyage, in highest class English iron steamers in Lloyd's Register, is reasonably safe for a voyage with a cargo of sugar from Iloilo to the Delaware break-water by way of Colombo, Aden, and Gibraltar, and is seaworthy.

**2. SAME—EFFECT OF HURRICANE.**
A vessel sailed from Iloilo to Colombo, and thence made for Aden, but encountered a hurricane, and put in to Bombay disabled. During the hurricane the decks opened and leaked. Between Iloilo and Colombo no leakage occurred, though severe weather, driving the water over the decks, was met; and, after the decks had been properly recaulked, no leakage occurred. *Held*, as the hurricane amply accounted for the leaking of the decks, there was no presumption that they were in condition to render the vessel unseaworthy.

**3. SAME—NEGLECT TO MAINTAIN IN SEAWORTHY CONDITION.**
A vessel's decks, which had been sprung in a storm, were recaulked and resheathed at Bombay under the direction of surveyors, one of whom was the agent of the underwriters of the cargo. The work was rendered imperfect by continuous rains. During the voyage thence to Aden the caulking worked out, and the decks leaked. *Held*, it not appearing that the renewal of the deck would have prevented leakage, there was no neglect to keep the vessel in a reasonably seaworthy condition.

**4. SAME—STRANDING—NEGLIGENCE.**
A vessel ran at night on a coral reef in the Red sea, a few miles off Mocha. The evidence showed that stranding at that point was not uncommon, through suddenly arising unusual currents that carry a vessel imperceptibly off her course; and that the nearness of the reef could not be discovered by sounding. *Held*, as the master knew of the reef, and was justified in believing himself at a proper distance and on his proper course, the stranding was not negligence.

**5. SAME—JETTISON.**
A vessel put into Bombay with part of her cargo of sugar damaged. By recommendation of surveyors a part of the cargo was there sold. While in the Red sea she grounded on a coral reef near Mocha, and jettisoned some more, and, on arriving at Mocha, sold some more that had been taken off when aground by lighter. *Held*, as the sales had been recommended chiefly by surveyors, and as at the time of the jettison the ship and cargo appeared in imminent danger, and would have been totally lost had any rough weather come on, and the chance of relief from Mocha did not appear to justify delay, and the jettison seemed a necessity, there was no improper conduct on the part of the master.

**6. SAME—FUEL FOR STEAMER—SUFFICIENCY OF SUPPLY.**
The supply of fuel for a steamer is sufficient, although not sufficing to carry a vessel through an unusual gale or to a port not contemplated, for which she was forced to make, when the supply, both in quantity and quality, was equal to that usually taken, and more than sufficient for the voyage contemplated in usual weather.

**7. SAME—INJURIES BY STORM.**
Clogging of the forepeak pipe, resulting from loss of its use after the vessel left port, from the dashing about of loosened gear during a storm, is not negligence.

**8. SAME.**

The bow of a vessel was thrown up by a bar on which she had grounded at night, and the cargo was damaged by water from the bilges running into the after-hold through the open sluices. The evidence showed that the sluices were open at night for pumping. *Held*, no negligence shown.

**9. SAME—USE OF CARGO AS FUEL.**

A steam-ship, sufficiently coaled, going from Colombo to Aden, met a hurricane in her front, and, after failing to make way against it, and being much damaged, ran back to Bombay, the nearest available port. Her coal supply became exhausted, and much of the wood-work and part of the sugar forming her cargo was burned. *Held*, as persistence in her endeavor to push on would have imperiled ship and cargo, and as sufficient coal to take her to Bombay could not be expected to be carried, the consumption of the cargo was justifiable.

**10. SAME—INJURIES IN DOCK.**

A vessel, ordered into a dock by the superintendent of docks, chafed against and was injured by a piece of masonry projecting beneath the water, and was forced to unload and to go into dry dock. *Held*, no negligence in not making inquiries concerning such sources of danger.

In Admiralty. Libel by Ira Bursley against the steam-ship Marlborough and her master, John Kiddle, for damages to cargo, caused by alleged unseaworthiness of ship and alleged improper conduct and negligence of master.

*Curtis Tilton* and *Henry R. Edmunds*, for libelant.

*Morton P. Henry* and *J. Rodman Paul*, for claimants.

BUTLER, J. The libelant, Ira Bursley, and Galbraith, Pembrook & Co., owners of the Marlborough, entered into a charter-party, dated London, April 16, 1889, whereby they agreed that the Marlborough should go to Iloilo, and there load from the libelant's freighters a full cargo of dry sugar, and therewith proceed to the Delaware break-water for orders; the cargo to be delivered at Boston, New York, or Philadelphia, as ordered, on payment of the specified freight. It was further agreed that "the act of God, perils of the sea, * * * and other accidents of navigation, * * * even where occasioned by the negligence, default, or error of judgment of the pilot, master, mariners, or other servants of the ship-owners," shall be excepted from the respondents' risk. The voyage thus undertaken led from Iloilo, (Philippine islands,) in the Pacific ocean; thence through the China sea to Singapore; across the North Indian ocean to Colombo; across the same ocean to Aden, near the south entrance of the Red sea; through this sea to Suez; and through the Suez canal and Mediterranean to Gibraltar, and thence across the Atlantic ocean. In the course of it steam-vessels usually stop for fuel and other necessaries at the several places named. The vessel went to Iloilo, and in due course took on a cargo of sugar, and started on her voyage. She reached Colombo, nearly 3,000 miles distant, without unusual incident. Rough weather was encountered during several days, but no rougher, probably, than is common to the locality and season. On her way from this place to Aden, and when from six to seven hundred miles distant from the latter, she encountered exceptionally bad weather, a hurricane or cyclone of great violence, coming from the south-west and west, raising a rapid current, directly in her front, of such force as not only to arrest her progress, but to drive her many miles back. After continuing her efforts to get forward until the supply

of coal had run short, the rudder damaged, and the forecastle decks sprung and opened so as to admit large quantities of water, she turned about, and ran with the current to Bombay, the nearest available port. To reach this place it became necessary to use all available wood-work of the vessel, and a large quantity—about 1,100 bags—of the cargo, for fuel. On arriving there, a survey of the vessel and cargo was called for and made. By order of the surveyors a part of the cargo was unloaded, and the vessel put on dry-dock. Examinations showed that the decks were strained and injured, the rudder and propeller damaged, and other injuries sustained. After considering the advisability of repairing the deck by renewing the parts injured or caulking and sheathing, the latter was adopted. A part of the cargo was so damaged that the surveyors recommended its sale. A smaller part was, however, in such condition that the health officer of the port ordered its destruction. The balance (about 360 bags) was sold. Upon being repaired, the vessel went into dock to reload. While lying there she was again injured by rubbing against a projection of masonry at one side of the dock, several feet below the water's surface. A leak was thus caused, which required the vessel to be put back in the dry-dock and again repaired. The additional handling of cargo thus made necessary (and possibly some further wetting) increased the damage. After the injury was repaired, and the vessel reloaded, she started for Aden. On the way much rough weather was encountered, though not more or rougher, probably, than should have been expected; and the decks again opened and leaked. After entering the Red sea she ran upon a coral reef in the dark, (at night,) a few miles off Mocha, and for some time was in very serious danger. She consequently jettisoned a part of her cargo, (about 340 bags,) and subsequently sold, at Mocha, nearly 1,400 more, which had been taken off by lighters, sent from that place, while she was aground. On getting free, and after proceeding to within a few miles of Suez, she again grounded upon a sand-bar, in the night; and some further damage was sustained by the cargo through the escape of water from the bilges into the after-hold; the sluices being open to admit of pumping, and the vessel's bow thrown up by the bar. On getting free and reaching Suez, to which place a part of the cargo had been carried while she was last aground, it was deemed prudent (after another survey) to make sale of about 2,300 bags more. The vessel was recaulked at this place, under more favorable circumstances than at Bombay, after which she proceeded on her voyage, and reached the Delaware break-water without further accident, delivering the balance of her cargo in good condition.

The libelant demands compensation on the grounds, substantially, that the vessel was unseaworthy when started; that she was carelessly navigated and handled; and that a part of her cargo was unnecessarily and wrongfully sacrificed by jettison and sale. After a full examination of the case, I am of opinion that neither of the charges is sustained. The questions presented are all, substantially, of fact, and must be determined by the evidence. This I have read carefully and repeatedly without finding anything in it irreconcilable with the belief that the vessel was seaworthy when started, and was kept in this condition there-

after, or as near it as was practicable; that she was carefully navigated and handled; and that the jettison and sales of the cargo were justified by the circumstances under which they were made. Of course the testimony may be so culled, parts detached and read separately, as to lend an appearance of support to these charges. Taking the entire statements of the witnesses, however, and applying an impartial judgment, I do not think anything can be found to sustain the libel. The loss of the cargo is, I believe, properly ascribable to perils of the sea, of which the libelant assumed all risk.

A written discussion of the questions and analysis of the testimony would require much time and space, and afford no corresponding advantage. A few general observations on the specific charges will express all I desire to add. What constitutes seaworthiness is not, I think, open to controversy. The vessel must be reasonably safe for the service and voyage undertaken. There are, however, degrees of safety; and she need not be the safest. A new vessel, of the highest order of construction, is safer than one several years old, and of a lower order of workmanship. Yet the latter may be, and, if in good condition, is, seaworthy. A majority of vessels in the merchant service, employed on the most dangerous voyages, are of the latter description. The vessel, however, must not only be seaworthy when entering upon the voyage, but must, in so far as is reasonably practicable, be kept in this condition throughout its course. The Marlborough was built of iron in 1877, was kept in good repair, and, when started on this voyage, was rated in the highest class of English iron steamers on Lloyd's Register. The specifications on which the charge of unseaworthiness rests are, substantially, that the decks were worn out; that she was overloaded; that she was not sufficiently provided with coal; and that the decks should have been renewed at Bombay, if not before starting. The decks seem to have been in good condition when she left Iloilo. Notwithstanding the rough weather encountered for several days on the passage (covering nearly 3,000 miles) to Colombo, which drove the water over her, there was no leakage; and after the leaks were recaulked at Ceylon, where the work could be well done, she crossed the Mediterranean and the Atlantic,—a distance of more than 3,000 miles,—with a good deal of rough weather, in safety. I do not attach serious importance to the fact that the decks had needed repair a year or more before the vessel started. They had been repaired, and subsequently. Nor do I attach serious importance to the fact that they opened and leaked after the vessel passed Colombo, and had been subjected for many days to the severe weather of the monsoon. Whether decks be new or old, the pitching and twisting and pounding of the vessel in such weather will be likely to cause leakage. Such a result cannot, therefore, under such circumstances, be accounted evidence of unseaworthiness, even when the tempestuous weather is anticipated at starting. Some damage to cargo, under these circumstances, is probable, if not unavoidable. It is not clear, however, that any damage was sustained from leakage until after the hurricane or cyclone was encountered, beyond Point De Galle. The weather through which the vessel then passed is amply sufficient to account for the crippled condition in which

she reached Bombay, without the aid of any inference of unseaworthiness at starting. But for this storm, I find nothing to justify belief that she would not have continued her course, and reached Aden safely, with little or no loss to cargo. In that case the question of seaworthiness could not have arisen, and what is now said of her decks, overloading, insufficiency of fuel, would not have been thought of. It is inspired by the desire to find some other cause of disaster than the storm,—a sufficient, the most obvious, cause,—and thus to charge the vessel with loss, which otherwise the libelant must bear. Was she restored to a seaworthy condition, or proper efforts made to restore her, at Bombay? Everything the surveyors recommended was done; and this, in their judgment, and that of the officers, was all the safety of the vessel and cargo required. It appears that the owners did not want the deck renewed, but it does not appear that the surveyors were influenced by this, or considered renewal necessary. One of the surveyors, Mr. Clark, represented the cargo as agent of the underwriters, and was therefore interested in securing a safe carriage. It is urged that the decks should have been renewed here at least. If they had been, it is not certain, nor very probable, that they would have withstood the storm and strain any better. It is quite likely the seams would have opened, and the caulking worked out, under the pitching and twisting to which the vessel was subjected again on this part of the voyage. The circumstances under which she was repaired at Bombay were unfavorable to the work. The constant and unprecedented rain rendered the sheathing and caulking imperfect; but not more so, probably, than it would have rendered the renewed decks, if this method of repair had been adopted. I do not find any support for the allegation of overloading. The Plimpsol mark on the vessel—the guide in this respect—was above the water. Nor do I find anything to support the allegation of insufficient coal. The quantity taken at Colombo (and the quality) was equal to the usual supply for a passage to Aden. The bunkers were full; and the amount would have been more than sufficient, but for the unexpected tempests encountered after passing Point De Galle. The clogging of a forepeak pipe resulted from the loss of its rose, and this loss occurred after the vessel started on her voyage. Its displacement is doubtless attributable, as Mr. Arnott says, to the dashing about of loosened gear during the storm. The clogging of the pipe could not, therefore, be guarded against. The sluices do not appear to have been unnecessarily open. When open at night, as the witnesses say, it was to admit of pumping. Those uncovered at the time of grounding near Suez were, the witnesses testify, open for this purpose. The specifications of negligence and improper conduct (not connected with the question of seaworthiness) are, substantially, the consumption of sugar for fuel, improper docking at Bombay, straining in the Red sea, and jettison and sale of cargo. The first has been sufficiently remarked upon in considering the question of seaworthiness. The run to Bombay, and the consumption of sugar to enable the vessel to make it, seem clearly to have been necessities of the situation, which could not be foreseen or avoided. Persistence in the effort to pass through

the storm to Aden would have seriously imperiled both ship and cargo, even had the supply of coal been double what it was. A supply for the run to Bombay could not be expected. The charge of improper docking does not seem to find any support in the evidence. The vessel was ordered in where she went by the superintendent of docks, and was therefore fully justified in believing that she could safely lie there. The obstructions against which she chafed were hidden several feet below the water's surface. She cannot be held to the duty of inquiring for such sources of danger. To so hold would clearly be unreasonable; and, without inquiry, she could not discover them. The injury was repaired as speedily as possible. The stranding in the Red sea is attributable, I believe, to a sudden and unexpected starting of an unusual current under the influence of wind or change of temperature, such as frequently occurs in that locality. Stranding is not uncommon there; and when such unusual currents are encountered at night it cannot, probably, be avoided. The vessel, as the witnesses testified, is gradually and imperceptibly carried off her course, and, before the fact is discovered, runs aground. It is improbable that sounding would reveal the presence of a perpendicular reef projecting in the midst of deep water. The vessel would be likely to strike while the lead showed ample depth. Soundings are not, therefore, commonly resorted to in that locality. The existence and situation of the reef is marked on the chart, and was known to the master. This, however, afforded him no protection under the circumstances. He thought, as he testifies, he was on the proper course to avoid it, and at a safe distance; and he was, I think, justified in so believing. Substantially the same may be said of the grounding near Suez. The jettison and sales of cargo seemed to have been justified by the circumstances. The sales were principally recommended by surveys. A proper regard for the libelant's interest seemed to require them, and I do not see how they could have been made more advantageously. A jettison also appeared to be necessary at the time, however it may appear in the light of subsequent events. The entire cargo, as well as the vessel, was in imminent danger. A sudden blow, or roughening of the sea, such as might be expected at any moment, would probably have sent both to the bottom. It was important, therefore, to get afloat as soon as possible. The chances of obtaining relief from Mocha (in the light of all the master knew at the time) did not justify delay in looking or waiting for it. When relief came from that quarter next day it was neither efficient nor reliable. The jettison seemed to be a plain necessity. Had the master neglected this means of relief, and the ship and the cargo been lost, he might, I think, justly be accused of failing in duty. The important questions of law raised upon the "negligence clause" of the charter-party need not be considered. In this view of the facts they are not reached. The libel must therefore be dismissed, except so far as respects the subject of average, which is not ready for hearing, and a decree may be prepared accordingly.