**UNITED STATES STEEL PRODUCTS CO. v. AMERICAN & FOREIGN INS. CO. et al.**

No. 285.

Circuit Court of Appeals, Second Circuit.

March 9, 1936.

Bigham, Englar, Jones & Houston, of New York City (D. Roger Englar, Henry N. Longley, and Alfred Ogden, all of New York City, of counsel), for appellants.

Kirlin, Campbell, Hickox, Keating & McGrann and William H. McGrann, all of New York City, for appellee.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal by the respondents from a decree in the admiralty in a suit in personam against underwriters for general average contribution. The libellant is the owner of the ship, "Steel Scientist," which went ashore in the Caribbean on the little islet of Farallon Sucio, a few miles off the coast of Panama and twenty-four miles from the Colon breakwater, on April 13, 1926. She was floated and most of the cargo eventually delivered in accordance with the bills of lading, after executing general average bonds for the expenses incident to the salvage. The underwriters of these bonds are defending this suit upon the ground that the strand was the result of negligent navigation and that although the bills of lading contained the "Jason Clause," the ship was unseaworthy when she left New York on April 6, 1926, because her charts and light lists had not then been brought up to date. The judge held that the ship had proved her seaworthiness in this and all other respects, and it is conceded by both sides that the strand was due to the negligent navigation of the master. Since May v. Hamburg-Amerikanische Packetfahrt Aktiengesellschaft, 290 U.S. 333, 54 S.Ct. 162, 78 L.Ed. 348, it is not necessary in such situations that the ship's defect should contribute to the loss; section three of the Harter Act (46 U.S.C.A. § 192) makes her fitness in every detail a condition upon her excuse for her negligence. In this case the controversy centres upon the

fact that when the ship broke ground she had not marked upon her chart of the Farallones, or entered in the American light list, or the American pilot book, a new light upon Farallon Sucio, which had been in operation since October 30, 1925. The weekly pamphlets, entitled, "Notices to Mariners," issued by the Hydrographic Office in Panama on September 4, 1925, and in Washington on September 26, had declared that such a light was to be set up; and the ship sailed from New York on an earlier voyage on October sixth without them. When she sailed on the voyage now in question, the Office had published later pamphlets with notices that the light was in actual use, and these she had; but she had not used them to correct the chart, or the American light book. On the other hand the second of two supplements to the British light book mentioned it, and was in its proper place inside the cover of the copy of that manual kept in the chart room; and there was also on board an annual supplement to the American Pilot which showed the light and the proper slip from which had been pasted in place before the ship neared it, though not when she sailed.

She was bound on a voyage around the world, and her first landfall after leaving New York was San Salvador, from which she would pass through the Windward Passage and so to Colon, the last few miles being along that part of the coast of Panama, off which lay the Farallones. Her charts and the three navigating manuals concededly made up a sufficient equipment, had they been corrected, and the British light list, as much corrected as it was possible to make it, stood at hand if the navigating officer wished it. The American light list could be brought up to date by pasting on the proper pages slips cut out from the "Notices to Mariners" which told the proper page where they should be put. Moreover, the slips were arranged topographically with proper territorial references, the Farallones being under the caption, "Panama," and "Panama" in its proper geographical sequence between, for example, Nicaragua and Colombia. A mariner bound through the Caribbean could learn what changes to make in his charts and light list by at once turning to the pages which referred to those waters. It is true that there was an accumulation of these pamphlets on board when the ship left New York; said to amount to some nine hundred pages in all; but even so it would have

taken only a few hours at most to cull out from them all notices affecting the waters between New York and Colon and to bring the chart and the list up to date. As we have said, the American Pilot actually had been so corrected from its own supplement after leaving New York. The necessary information being thus at hand, the single question is whether it should all have been collated and put in its proper place before the voyage began. To an uninstructed landsman the answer seems obvious; it need not have been if before the ship reached the waters which the charts and the lists covered they could conveniently be brought up to date; if that was not done, it was due to the negligence of the crew during the voyage, not to faulty equipment, and the ship was not unseaworthy. An exception need be made only as to waters that the ship must enter at once or too soon for the necessary correction. Unless there is some preponderant competent nautical opinion to the contrary, we cannot therefore see why the "Steel Scientist" was not seaworthy when she sailed.

■ A large amount of expert testimony was in fact taken on this issue. Disregarding Cetti, the ship's second officer, who was under fire, and Donnelly, the libellant's marine superintendent, also an interested witness, there were in all thirteen navigators who spoke as experts, nine called by the ship, and four by the underwriters. Seven of the libelant's nine said without qualification that it was enough to have the charts corrected by the time the ship reached the locus in quo. If this was true of charts, it was à fortiori true of light lists, for all the witnesses agreed that charts were the most important guides for navigation. Of the two other ship's experts Halvorsen thought it was a matter for the master's choice and he must therefore be counted with the other seven; but the ninth, Bertie Smith, considered that all corrections for the first leg should be made before the ship left port, and that on this voyage the first leg was from New York to Panama. He would not say absolutely that under no circumstances this might not be deferred to the first day or so out in cases where information comes in on the last day, but on the whole he was with the underwriters. Of their four witnesses two, Jessop and Sheridan, were quite positive that all corrections should be made before sailing, and though McCaw and Sheppard

limited this to the first leg of the voyage, they considered this to include the whole course from New York to Panama. From all of this we agree with the experienced judge who saw all but two of these witnesses, that while there are masters who insist upon having their charts corrected for the first leg before breaking ground, there are others, properly qualified and reasonably cautious, who do not. A ship must indeed be reasonably fitted for her service, but ordinarily she need not conform to a higher standard of care than that which prevails among duly accredited masters of experience. The New York, 204 F. 764, 765 (C.C.A.2) ; Adams v. Bortz, 279 F. 521, 522 (C.C.A.2) ; Spang Chalfant & Co. v. Dimon S. S. Corporation, 57 F.(2d) 965, 967 (C.C.A.2) ; Louis-Dreyfus v. Paterson Steamships, 67 F.(2d) 331 (C.C.A. 2) ; The Marlborough (D.C.) 47 F. 667, 670; The Cabo Hatteras (D.C.) 5 F.Supp. 725, 736. Sometimes courts do indeed exact more [The T. J. Hooper, 60 F.(2d) 737 (C.C.A.2)] ; but we can see no reason to do so here. Surely it is absurd to demand that a vessel about to start on a westward voyage around the world must have her charts for the British Channel corrected to date, if all the material be at hand and her officers have months to prepare. Unless we go so far, the question must be one of more or less, and that is indeed the all but unanimous opinion. If so, it comes down to whether the whole first leg of the voyage must be necessarily considered as one, no matter what its length or nature. That would be an arbitrary division with nothing to recommend it but its definiteness. The leg might last for a day, a week or a month; it might be a journey of continuous coasting, where lights are encountered all the way, or there might be no landfall for the whole distance. Surely it would be unreasonable to group all such together because the voyage could be conventionally divided into parts. The rational rule is that adopted by the majority of masters, which is no more than that the corrections must be made in season.

The evidence, drawn upon the rule-books of steamship lines and from text-books, also seems to us inconclusive. All these do emphasize the importance of having charts and light lists "kept up to date"; and obviously that is an important admonition; when the time comes to look at a chart or a list, it must be in order, for it is then too late to correct it, or to look elsewhere.

But we are not satisfied that the lines mean to require this to be done before the ship sails, except in one or two instances. Lecky's Wrinkles in Practical Navigation (page 108), declares that the British Board of Trade in 1912 had issued a notice that charts must be corrected to the time of sailing when *taken on board,* and Lloyd's Calendars for 1924 and 1931, seem to contemplate the same thing. But these lay down the absolute doctrine which, as we have said, seems to us an unnecessary counsel of perfection and which we are not disposed to enforce. On the contrary we believe that a ship is well found, if she has the proper documents on board, and if when she sails, such of her charts and light lists are corrected as cover the waters she will enter before her officers will have ready opportunity to correct them. In the case at bar the possibility that the seven days before reaching Colon might be so occupied as to leave no opportunity to the second officer to do this work, seems to us very remote; and besides, it was desirable, if safe, to wait till the last moment before going to the Hydrographic Office, so as to get the latest information. The ship was not likely to encounter serious weather or to be hard pressed; spring had fully come, the hurricane season was long past, the ship would pass San Salvador four days before she reached the Canal. It is of course true that section three of the Harter Act (46 U.S.C.A. § 192) is a privilege not granted to other principals of negligent servants, and it has been somewhat jealously construed. The Irrawaddy, 171 U.S. 187, 195, 196, 18 S.Ct. 831, 43 L.Ed. 130; The Germanic, 124 F. 1, 5 (C.C.A.2) ; Benner Line v. Pendleton, 217 F. 497, 505 (C.C.A.2) ; The Fort Morgan, 284 F. 1, 4 (C.C.A.4). Still the question is of wider importance than the immediate situation before us; it will affect other legal transactions as well and there is no reason why we should hold ship owners to refinements of care which go beyond the practical wisdom of the calling.

Finally the argument is made that in any event the ship was not seaworthy on her earlier voyage because then at least, though she passed through the same waters, she did not even have on board the notices that a new light was to be set on Farallon Sucio. We cannot understand the force of this argument. What determined her fitness at that time, did not determine it later. She may have been unseaworthy without the preparatory notices on board, and

seaworthy when she had the later notices, as she did on April sixth. And because she started on April sixth with the omission due to earlier negligence still uncorrected, she was not for that reason alone unseaworthy. The same ship similarly equipped may be fit at one time and not at another, for one cargo and not for another. Though she did not have a properly marked chart when nearing the Farallones on the first voyage, it does not follow that she must correct that defect until she neared them again. She was not infected, so to say; her earlier faults are not to be imputed to her; nothing in her past mattered; all that did matter was that she should be reasonably fit for the new voyage when that voyage began, and that she was.

Decree affirmed.