15 F.Supp. 745 (1936)
THE MARIA.
ATLANTIC MUT. INS. CO. et al.
v.
COSULICH SOCIETA TRIESTINA DI NAVIGAZIONE, and three other cases.
District Court, S. D. New York.
July 9, 1936.
Bigham, Englar, Jones & Houston, of New York City (Henry N. Longley and Ezra G. Benedict Fox, both of New York City, of counsel), for libelants.
Loomis, Williams & Donahue, of New York City (Homer L. Loomis, of New York City, of counsel), for claimant-respondent.
HULBERT, District Judge.
These are four suits in admiralty tried together.
Claimant is the owner of the motor vessel Maria, a ship engaged in the carriage of general cargo. On June 12, 1932, she stranded on "Frying Pan Shoals" attempting to enter Wilmington, N. C. Upon her subsequent arrival at Trieste, Italy, consignees of cargo were required to make certain deposits to secure delivery of cargo free and clear of a lien for general average asserted by the shipowners. The deposits demanded were made under protest; the cargo owners, with one exception, upon receiving reimbursements for the deposits made, assigned their rights to the recovery thereof to their respective insurance carriers who had insured the cargo consigned to them.
These insurance companies and Silva Girolamo (in action No. 2), a consignee and *746 cargo owner, are libelants seeking recovery of the deposits made.
The cargo consisted chiefly of cotton, rice, and lumber. A shipment of phosphate rock (1,101 tons), received in good order, was delivered wet with sea water and short in quantity. The Continental Insurance Company of New York paid the cargo owner for the loss sustained and sues (in action No. 2) as subrogee, both for the physical damage and loss of cargo, as well as the deposits which it refunded to the consignee.
All of said cargo was loaded at American ports, and bills of lading (except the one issued for the phosphate) contained the so-called Jason clause, which reads as follows: "If the owner of the steamer shall have exercised due diligence to make said steamer in all respects seaworthy and properly manned, equipped and supplied, it is hereby agreed that in case of danger, damage or disaster resulting from fault or negligence of the pilot, master or crew in the navigation or management of the steamer, or from latent or other defects, unseaworthiness of the steamer, whether existing at time of shipment, or at the beginning of the voyage, but not discoverable by due diligence, the consignee or owners of the cargo shall not be exempted from liability for contribution in General Average, or for any special charges incurred, but, with the shipowner, shall contribute in General Average, and shall pay such special charges, as if such danger, damage or disaster had not resulted from such fault, negligence, latent or other defects or unseaworthiness; * * *"
Among other defenses, the claimant alleges: "The subject matter of the libel has already been passed upon and adjudicated by the Royal Civil and Penal Tribunal of Trieste between the parties hereto and/or their privies and that the right and duty of the general average adjuster to retain the deposits here in question is res adjudicata."
The real issue is whether the vessel was seaworthy as to navigational equipment.
The motor vessel Maria was a steel-hull ship 418 feet long, 53.2 feet beam, 24.7 feet draft, and 6,000 tons, gross tonnage, Italian Registry, home port Trieste, from whence she sailed on the trip in question; this being Captain Gladioli's third voyage as master to South Atlantic and Gulf ports of the United States. She touched and loaded cargo at, and sailed successively from, Tampa, Fla., on May 2, 1932, Mobile on May 10, New Orleans on May 20, Houston on June 5, Galveston on June 7 for Wilmington, N. C., and thence to Italian ports.
The master testified that when he sailed from New Orleans, he did not know that Wilmington, N. C., was to be a port of call. He had never been there before. The clearance of the vessel at New Orleans, signed and sworn to by him, sets out Wilmington, N. C., as one of the intended ports of call, and the vessel's agents had prior thereto, and on May 4, 1932, entered into a contract with Cape Fear Shipping Company of Wilmington, N. C., for the carriage of cotton from that port to Italy. But the master's explanation was that he signed the clearance in blank and swore to it in the Customs House without knowledge of its contents.
On July 16, 1930, and for some time prior thereto, the position of Frying Pan Shoals Lightship was Lat. 33° 34' 00" N., Long. 77° 48' 30" W., and buoy 2AFP was Lat. 33° 28' 30" N., Long. 77° 36' 00" W. On that date, the position of the lightship was changed to Lat. 33° 28' 00" N., Long. 77° 33' 45" W., a distance of about 14 miles oceanward, and the position of buoy 2AFP was changed to Lat. 33° 34' 00" N., Long. 77° 48' 30" W., a distance of about 12 miles, or to the same position as the lightship formerly occupied.
On March 3, 1931, buoy 2FP, which had prior thereto been shown on the Coast and Geodetic charts of the Department of Commerce of the United States as an unlighted whistle buoy, was thereafter chartered as a lighted buoy.
The master testified that he had on board the Maria at Galveston:
(Exhibit C) "Lights and Tides of the World," Twenty-Seventh Edition, 1926, which at page 838, sets out the position of the Frying Pan Shoals Lightship and buoy 2AFP as they were prior to July 16, 1930, and contains no reference to buoy 2FP being a lighted buoy.
(Exhibit D) The American light book, "Light List Atlantic Coast United States," published by the United States Department of Commerce, Edition of 1930, which, at pages 288, 289, sets out the position of the lightship and buoy 2AFP as they were prior to July 16, 1930, and contains no reference to buoy 2FP being a lighted whistle buoy. This publication is issued annually, and the 1931 edition, issued prior to April of that year, sets out the correct positions of the lightship and buoy 2AFP as they were on and after July 16, 1930.
*747 (Exhibit E) "United States Coast Pilot, Section D, of the Atlantic Coast," Edition of 1922, which describes the position of the lightship and buoy 2AFP as they were prior to July 16, 1930, and buoy 2FP as an unlighted whistle buoy.
In 1932, the current edition of this publication was that of 1926, but the book was designed to be kept up to date by annual supplements and, between supplements, by notices to mariners. The supplement of 1930, issued in September of that year, set out the correct position of the lightship and buoy 2AFP.
(Exhibit H) C. & G. S. Chart 1236, dated June 1926, corrected to February 16, 1928; (Exhibit J) C. & G. S. Chart 1001, dated May 1926, corrected to October 30, 1926; (Exhibit K) C. & G. S. Chart 1002, dated January 1922, corrected to October 7, 1926.
The master also claimed to have on board (Exhibit L) C. & G. S. Chart 1112, dated March 1923; (Exhibit M) H. O. Chart 943, dated January 1923, corrected to May 2, 1925; and (Exhibit N) C. & G. S. Chart 1110, dated November 1925, corrected to October 9, 1926.
All of these charts show the lightship and buoy 2AFP as they were prior to July 16, 1930, and buoy 2FP as it was prior to March 3, 1931.
The United States government issues monthly "change lists" which are sent to all branch Hydrographic offices and H. O. agents, listing new editions of charts, and designating prior issues as obsolete and proscribing their use. New charts had been issued supplanting all of the foregoing on or prior to February 12, 1931. Information that changes in the position of Frying Pan Shoals Lightship and buoy 2AFP were to be made were set out in "notices to mariners" dated January 1, Jan. 11, March 19, March 29, May 28, June 7, July 9, 1930, and H. O. memo July 10 and H. O. bulletin July 16, 1930. Advice that changes in the relocation of the lightship and buoy 2AFP had been effected July 16, 1930, were sent out in H. O. publications of July 17 and 23, 1930, and "notices to mariners" July 23 and 26, 1930, and both the Italian and British governments issued notices to mariners setting out said changes.
Information of the change to be made in the characteristics of buoy 2FP was given in H. O. publication of Feb. 21, 1931, and notice to mariners February 11 and 25, 1931, and advice that such change had been effected was given in notice to mariners dated March 1, 1931, and H. O. publication of March 21, 1931. There was, and had been for twenty years, a branch Hydrographic office in New Orleans and Galveston, and, for fifteen years, a field Coast & Geodetic Survey office at New Orleans. Branch Hydrographic offices are required by instructions of the Department of Commerce to keep available for examination of all mariners (both American and foreign) corrected charts, H. O. and C. & G. S. Light lists, Coast Pilot Books and their supplements, H. O. bulletins and H. O. notices to mariners. The latter will be delivered to any mariner upon request. The H. O. and the C. & G. services also have agents in various Gulf seaports for their respective publications, and there were such agents in Tampa, Mobile, New Orleans, and Galveston when the Maria visited these ports.
The master also claimed to have on board (Exhibit B) "Radio Aids to Navigation," Edition of 1930, which sets out the position of radio compass stations and radio beacons, and states in the third paragraph of the preface, "the latitudes and longitudes given in this list are approximate and are merely intended to facilitate reference to a chart," and gives Lat. 33° 28' 4" N., Long. 77° 33' 45" W. as the location of the lightship as it was on and after July 16, 1930. In explaining his use of Radio Aids to Navigation, the master testified: "If I need to have bearings (on a lightship having a radio bearing) in that moment, I open my chart and I control the chart with the Radio Aids to Navigation * * *."
The third officer testified that the Radio Aids to Navigation was employed in connection with the use of the radio, while "Lights and Tides of the World" was used to check the position of all lights, to which he added, upon redirect examination, "Except those having radio beacons."
It is also claimed by the master that the wireless operator aboard the Maria had his own books supplied by the Marconi Wireless Company with whom Captain Gladioli asserted that, at the beginning of each voyage, or leg of the voyage, he checked up both books in respect to positions and characteristics of all radio beacon stations within sixty miles of the contemplated course; that such checking was done at Galveston before sailing for Wilmington, and revealed that both books agreed as to the position of Frying Pan Shoals Lightship. The captain's particular attention was called to it *748 at Galveston, when, in keeping with his customary practice, he pasted in "Lights and Tides of the World" certain notices to mariners and, in so doing, at page 838, supra, he found the appropriate place for one such notice was immediately above a previously inserted notice which he then noted set forth the supposed position of a wreck  the dredge Playa  with reference to buoy 2AFP and, he stated, in order to determine whether the wreck might possibly be on his course, he looked at an unused chart which the chief officer had previously put before him in the chartroom as a chart appropriate for use on leaving Wilmington (Exhibit H, supra), and observed that the fixed point given as the supposed position of the wreck did not bear anything like 18 degrees from buoy 2AFP as stated in the notice to mariners and shown on that chart. Thereupon he concluded that the position of the buoy must have been changed and, acting upon the information contained in the notice to mariners, he determined the new position of 2AFP as in the identical position in which the lightship was shown on his chart and decided the lightship had been moved to a new position and, after consulting "Radio Aids to Navigation" and there observing the location of the lightship was given as it was after July 16, 1930, and then being about to correct his chart accordingly, he was called from his cabin to sign various documents which required his signature before the vessel could leave port, leaving the chart on the table with the intention of making the change as soon as he could do so after the vessel had sailed, but he neglected to fulfill that alleged determination.
The captain also testified that his attention, while at Galveston, had been called to a change affecting Cape Lookout Lightship, but that notice to mariners was not pasted in "Lights and Tides of the World" because it referred to a replacement and not to a change in position or characteristics.
Captain Gladioli testified before me that, upon leaving Galveston, he intended to steer a course straight up the coast to the Cape Fear river entrance buoy, which would take him 40 miles to the westward and entirely out of sight of Frying Pan Shoals Lightship, but that, on the evening of June 10 after he had retired for the night and the Maria was in the vicinity of Jupiter Inlet Light (Florida), he considered the prospective time of arrival at Wilmington and concluded that, by continuing on the contemplated course, it would be after 8 a. m. on June 12; he would be required to pay full days' wages for loading cargo, and, so as to be able to arrive before 8 a. m., he decided to take advantage of the strong current which the ship was then experiencing in the Gulf stream to a point south of Frying Pan Shoals Lightship, and thence to shape his course westwardly to the entrance of Cape Fear river, and thus recalled for the first time during the voyage, what he had mentally noted at Galveston in connection with the changes affecting the location of the Lightship. But, as he revolved the facts over in his mind he testified, he had the fixed impression that it was the Cape Lookout Lightship that had been moved and that the Frying Pan Shoals Lightship had merely been replaced, but thought no more about the matter, neither taking the trouble at that time, nor at any time thereafter, to verify his fixed impression.
The steering course, he stated, was actually changed at 3 p. m. on the 11th from that originally contemplated and, after he had left the bridge on the evening of that day, he advised the chief officer that the lightship would probably be sighted shortly after the chief officer assumed his watch at 4 a. m. the next morning. However, the second mate telephoned the captain in his cabin at 3:15 a. m. that the lightship had been sighted and was directed to change his course 7 degrees to port. Thereafter, the captain went to the bridge and found the vessel then on a course 348 degrees true, which was changed at 4 a. m. to 336 degrees true and continued until the vessel came beam of the lightship when her course was changed to 329 degrees true. A bow and beam bearing having been taken on the lightship revealed that the Maria was passing at a distance of 4.4 miles.
During all of this time, the captain claims that he had still been of the fixed impression that it was the Cape Lookout Lightship that had been moved in position and that Frying Pan Shoals Lightship had merely been relieved with a replacement, and that everything in the vicinity of Frying Pan Shoals was as shown on his uncorrected chart.
Of course, none of his navigation officers could have had the knowledge of the true condition which, if once possessed by him as a mental impression, had since been forgotten or confused. Therefore, it would be expected, as he said, that after passing the lightship, buoy 2FP should appear on his starboard hand, but, instead, he picked it up on the port side after the vessel had *749 proceeded for about 20 minutes beyond the lightship. The mate, taking a glance at the buoy through his glasses, started for the chartroom to control or check the position of the lightship as shown on the chart by its position as given in "Radio Aids to Navigation," but was prevented from so doing by the captain, since the latter had checked its position as before stated. At the same time, the captain believed the change in the real position of the ship and buoy from what it should have been, was probably due to the ship's drifting with the current more than anticipated, or to the buoy having shifted from its old position and he determined that, under the circumstances, the proper thing to do was to change the heading of the ship so as to pass to the south and west side of the buoy and on a line close enought to the buoy to enable them to identify it by its lettering and numbering, and the course was changed accordingly. The vessel passed within two-tenths of a mile of the buoy. He then saw "2FP" and determined that it was in the position that 2AFP should have occupied and, satisfied that the mystery of the moving of the buoy abeam of which they were was solved, and convinced that it was in fact 2FP and not 2AFP, the master changed the heading of the ship's course to 334 degrees true, intending to proceed up to the sea buoy off the entrance to the Cape Fear river. That course was continued for about 24 minutes when structures on the shore were seen nearly straight ahead and the captain ordered the wheel "rudder hard over to the port" and, as soon as the ship's heading started to turn as thus directed, the vessel went aground.
A part of the deck cargo of lumber was jettisoned and the Maria was eventually hauled off her strand on June 16 and proceeded to and arrived at Newport News, Va., June 19, 1932, where repairs were made. While the vessel was at Newport News, a libel in rem was filed against her in the United States District Court for the Eastern District of Virginia to recover the value of the jettisoned lumber.
The master's deposition was taken in that suit. He produced a sealed bundle of charts and a sealed package of books which he had prepared for delivery to the Italian Consul to be forwarded to the Italian government. Subsequent to the taking of that deposition, with the permission of the Italian Consul, the seals were broken and the package was found to contain charts and books, which the master testified he had used on the leg of the voyage from Galveston to Wilmington. The deposition in the Virginia case is in evidence here. The master, in that deposition, gave the position of stranding as Lat. 33° 43' 7" N., Long. 78° 3' 00" W.
Immediately after the grounding, the master advised the ship's agents of his position and, thereafter, discovered that he was actually stranded in a position some 10 miles distant.
After arrival at Trieste, the master of the Maria applied to the Royal Civil and Penal Tribunal for the appointment of adjusters, but it does not appear that notice thereof was given to the cargo owners. He next applied to the same court ex parte and secured an order directing himself to turn over the general average deposits collected from the cargo owners through the consignees to the general average adjusters. He testified the adjusters did not interrogate him or any of the ship's officers in relation to the navigational equipment of the vessel from Galveston to Wilmington, but called upon the claimant alone for such information. It does not appear that any notice was given to cargo owners that the adjusters would consider the issue of seaworthiness and cargo owners were given no opportunity to offer any evidence upon that subject. Doubting their own qualifications, the adjusters wrote to one Captain Radonicich at Trieste and sought his expert opinion as to the seaworthiness of the vessel based on the data furnished them by claimant, and he replied by letter (and it seems certain he was not informed of the alleged use by the captain, and did not have submitted to him [Exhibit B] "Radio Aids to Navigation"). The approval of the adjustment was made without notice of the application therefor to cargo owners. It is contended by claimant that certain cargo owners or their consignees furnished, upon request by the adjusters, information regarding their respective consignments of cargo and thus became parties to the general average adjustment. Although neither the bill of lading nor the charter party covering the shipment of phosphate contained the Jason clause, a general average deposit was required to be made by the consignee of this cargo which was charged in the general average adjustment with a share of the shipowner's expenses and sacrifices.
Two witnesses, admitted to practice law in the Italian courts, were called as experts. *750 Francesco Ragno, for claimant, was graduated from the University of Bologna in 1910, spent the three following years preparing to take an examination for a position in the Judge Advocate Division and thereafter served as a judge in that division, principally in the Italian colonies in Africa, came to the United States in 1924, and has since been engaged here as an importer. Luigi Dionisi, for the libelants, was admitted to the bar in Italy in 1919, practiced law there for nine years, and has since been associated with a New York law firm and has appeared in several courts as an expert on Italian law. Both of these witnesses had read the orders for the appointment of the general average adjusters, the testimony taken by them, and the order approving their adjustment, and from their testimony, I find that the application by a shipmaster to the tribunal for the appointment of a general average adjuster is a voluntary or ex parte proceeding and the decree of the tribunal in such a proceeding is not a final judgment. A general average adjustment may be approved abroad by an Italian Consul or Consular Agent who is not a judicial officer and may be a lawyer or layman. The cargo owner may question and attack the validity of the adjustment by a separate suit commenced by service of process; or, if the adjustment shows the cargo owner to be a debtor and he refuses to pay, he may defend a suit brought by service of process and, in the defense of such suit by the owner, he may attack the general average adjustment. He might be estopped dependent upon his participation in the adjustment proceedings, but if he protests the vessel owner's right to contribution, he preserves his right to attack the adjustment.
Under the Italian Commercial Code, if a vessel strands as the result of the negligence of her officers in her navigation, the vessel owner is not entitled to contribution in general average from her cargo toward expenses and sacrifices arising out of stranding. As the Jason clause is interpreted by the Italian courts, if the vessel is unfit but that condition has no relation to the disaster, the vessel owner may secure contribution from the cargo.
The bills of lading covering the cargo in question, except phosphate, provide that the carrier shall not be liable for loss or damage occasioned by "stranding * * * (even when occasioned by the negligence, default or error in judgment of the pilot, master, mariners, or other servants of the ship owner, not resulting, however, in any case, for want of due diligence by the owners of the ship or any of them, or by the Ship's Husband or Manager)," and contains the following specific provision: "8.  General Average payable according to York-Antwerp Rules 1890. It is expressly agreed that General Average is always to be adjusted at Trieste, whatever may be the destination of the goods on board, and consignees engage themselves to sign the respective average bond for the appointment of the two adjusters of the Commercial and Maritime Tribunal of Trieste. Thereby consignees renounce to any objection and bind themselves to pay even by deposit in advance as estimated at port of destination on signing the average bond such contribution as will be apportioned by the average statement upon value of goods. If the owner of the steamer shall have exercised due diligence to make said steamer in all respects seaworthy and properly manned, equipped and supplied, it is hereby agreed that in case of danger, damage or disaster resulting from fault or negligence of the pilot, master or crew in the navigation or management of the steamer, or from latent or other defects, unseaworthiness of the steamer, whether existing at time of shipment, or at the beginning of the voyage, but not discoverable by due diligence, the consignees or owners of the cargo shall not be exempted from liability for contribution in General Average, or for any special charges incurred, but, with the ship owner, shall contribute in General Average, and shall pay such special charges, as if such danger, damage or disaster had not resulted from such fault, negligence, latent or other defects or unseaworthiness * * *."
Prior to the passage of the Harter Act, February 13, 1893, 46 U.S.C.A. § 190 et seq., the vessel owner could not secure contributions from cargo owners toward his own expenses and sacrifices in connection with a casualty resulting from the negligence of the vessel owner's employees, but he may now, under that act, by contractual provisions, secure contributions to the extent that section 3 permits a vessel owner to escape liability for damages to cargo resulting from such. The Jason, 225 U.S. 32, 32 S.Ct. 560, 56 L.Ed. 969; May v. Hamburg-Amerikanische, etc. (The Isis), 290 U.S. 333, 54 S.Ct. 162, 78 L.Ed. 348.
But the burden is upon the vessel owner to establish that his vessel was in all respects *751 seaworthy, properly manned, equipped, and supplied, or that he exercised due diligence to make her so.
In Daisy Phillipine Underwear Co. v. U. S. Steel Products Co. (The Steel Scientist) (D.C.) 11 F.Supp. 175, it was held that, if adequate navigational equipment had been provided by the owner and the required information was available for use, and the captain or navigating officer made no use or improper use of it, the vessel was free from fault. In affirming that case, U. S. Steel Products Co. v. American & Foreign Ins. Co. (C.C.A.) 82 F.(2d) 752, 754, Judge Learned Hand, writing for the court, said: "When the time comes to look at a chart or a list, it must be in order, for it is then too late to correct it, or to look elsewhere."
There is a great deal of conflict and contradiction in the testimony of the master as given in his deposition a few weeks after the stranding and upon this trial, nearly four years later.
While the chief officer and second and third mates confirmed his latter testimony in the main, it sometimes happens that officers of a vessel are prone to "stick to the ship." The Benjamin Noble (D.C.) 232 F. 382, 394; The Horaisan Maru (D.C.) 5 F. Supp. 311, 314; The Willowpool (D.C.) 12 F.Supp. 96, 99.
In view of his previous experience, it is amazing that the master should confess his hopeless incapacity to navigate the vessel as he does, and I prefer to disbelieve his testimony rather than accept his fantastic explanation and qualify him as a scapegoat to aid the ship owner in escaping liability. It has not been established by the testimony that (Exhibit B) "Radio Aids to Navigation" was available for use at all. It was not included in the records sealed for delivery to the Italian Consul; it was not specifically referred to in the deposition taken so soon after the stranding; it was not produced in the Virginia case pursuant to the subpoena for all light lists, pilot books, and sailing directions; and does not appear to have been called to the attention of or considered by Captain Radonicich. I am of the opinion, moreover, that when the vessel left Galveston, her master intended to take the course which he did take, and I hold that the owner did not use reasonable diligence to equip the vessel with sufficient data to insure her reasonably safe navigation into the port of Wilmington.
The United States government is at great pains and spares no expense, as is undoubtedly true with respect to the Italian government, to chart channels, post warnings of dangers to navigators, and keep up to date, and available for use, charts and other information at comparatively little or no expense. It is necessarily a part of the policy of insuring safety at sea in these enlightened times of modern inventions, and the maintenance of that policy requires the use of every reasonable effort to avoid or minimize danger on the high seas.
For these reasons, shipowners should be held to as strict accountability as modern facilities enable them, with reasonable diligence, to provide.
Therefore, under the terms of the bill of lading, there could not have been any justification for an appointment of general average adjusters at Trieste, and the proceedings in the Italian court certainly do not warrant the conclusion that the ex parte decree, there entered, is res adjudicata and bars the causes of action here. There will be a decree for libelants.
If these findings do not conform to Admiralty Rule 46½, 28 U.S.C.A. following section 723, either party may submit findings of fact and conclusions of law on five days' notice to the other.