94 F.2d 834 (1938)
THE W. W. BRUCE.
THE SAN VINCENTE.
WEYERHAUSER TIMBER CO. et al.
v.
CONTINENTAL S. S. CO. et al.
No. 58.
Circuit Court of Appeals, Second Circuit.
February 7, 1938.
Rehearing Denied March 4, 1938.
Burlingham, Veeder, Clark & Hupper, of New York City (Chauncey I. Clark and Stanley R. Wright, both of New York City, of counsel), for appellant.
Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Cletus Keating and W. H. McGrann, both of New York City, of counsel), for The San Vincente.
Bigham, Englar, Jones & Houston, of New York City (D. Roger Englar, T. Catesby Jones, James W. Ryan, and W. J. Nunnally, Jr., all of New York City, of counsel), for certain owners of cargo on The San Vincente.
Carter, Ledyard & Milburn, of New York City (Rush Taggart, of New York City, of counsel), for other cargo owners.
Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.
SWAN, Circuit Judge.
This litigation arose out of a collision between the steamships Bruce and San *835 Vincente which occurred in Craighill Channel in Chesapeake Bay on October 13, 1934, about 8:05 p. m. The Bruce, a tank steamer with a full cargo of bulk oil, was inbound for Baltimore; the San Vincente, with miscellaneous cargo and a deck load of lumber, was outbound from that port. For damages resulting from the collision, a libel was filed against the Bruce and her owners by owners of cargo on the San Vincente; similar libels were filed by other cargo owners. The owners of the Bruce impleaded the San Vincente and her owners. The owners of each vessel filed a libel against the other, and the owners of the San Vincente impleaded her cargo owners. The causes were consolidated for trial, which resulted in an interlocutory decree holding the Bruce solely at fault. Her owners have appealed. Owners of cargo carried by the San Vincente have filed assignments of error to rulings with respect to certain pleadings. The controversy thus raised has to do with the validity of a clause in the bills of lading and is material only if both vessels are held at fault.
In the District Court and in this court each vessel has contended that the collision occurred on her side of the channel and was solely due to the fault of the other in being on the wrong side. The trial judge found that the place of collision was on the westerly side of the channel, the San Vincente's side, and without fault on her part. All of the testimony was by deposition. Under such circumstances, the findings of the District Court, though not to be lightly disregarded on appeal, are not entitled to the same weight as when the trial judge has the advantage of drawing conclusions from the appearance of witnesses. On this appeal our opportunity to determine the crucial facts is equal to his. The Coastwise, 2 Cir., 68 F.2d 720, 721.
Craighill Channel is slightly less than 3 miles long; it is dredged to a depth of 35 feet at mean low water for a width of 600 feet. The channel course is N 5/8 E for inbound vessels, and the range lights are in line from a vessel in midchannel. The width of the channel is marked by even-numbered buoys on the east and odd-numbered buoys on the west. Some of these buoys had been moved out of position prior to the night in question, and an official Notice to Mariners, dated September 5, 1934, giving warning of their changed locations, was in force. At its northerly end Craighill Channel joins Cutoff Channel running N by W toward Baltimore. The junction is marked by lighted buoys, 2 K on the east and 13 C on the west. The San Vincente, followed by another outbound vessel, the State of Maryland, came down Cutoff Channel and rounded buoy 13 C into Craighill Channel. Between buoys 13 C and 11 C she was overtaken and passed on her right (the westerly side) by the Maryland. Disinterested witnesses from the latter vessel say that the San Vincente was then a little to the east of the center of the channel. As the Maryland was passing, the San Vincente blew a one-blast signal to the upbound Bruce, which was then about a mile away, and the Bruce answered with one blast, thus agreeing to a port to port passing. The Maryland continued on and passed the Bruce port to port a little below 9 C. According to the Maryland's officers the Bruce was then on the east side of the channel; but not nearly so far over as she claims; namely, about 75 feet from the eastern buoys. Shortly before the Maryland reached the Bruce, the latter sounded four or five short blasts, followed by a backing signal. The San Vincente and the Bruce were then about half a mile apart, and the reason given by the Bruce for sounding the alarm and putting her engines in reverse was that the San Vincente was still showing her green light. Despite the Bruce's danger signal, the San Vincente continued at full speed, 10 knots, and about half a minute later put her rudder hard right in an effort, as she says, to run out of the western side of the channel. The vessels came together with such violence that the stem of the Bruce was imbedded in the port side of the San Vincente to the depth of some 12 feet. The point of contact was 127 feet from her stem. The angle of collision was 45° according to the Bruce's testimony, and nearly 90° according to the San Vincente's. When the vessels came to rest, the San Vincente was against the western bank of the channel a short distance above buoy 9 C, and the stem of the Bruce was locked fast in her port side. According to the San Vincente's log, her engines continued at full speed ahead for two minutes after the collision. It is the contention of the Bruce that the collision occurred on the easterly side of the channel and that she was dragged by the San Vincente across the channel to the western bank. The latter contends that she was practically on the mud when the Bruce struck her.
*836 In our opinion both vessels must be held at fault. When the Bruce accepted the San Vincente's passing signal, she did not put her rudder right, her excuse being that she was already on the extreme east side of the channel and only about 75 feet from the buoys. This position is not only contradicted by the distance between the Bruce and the Maryland when they passed, as testified by members of the Maryland's crew, but also by the fact that with the buoys in their changed locations it would have put her just on the edge of the dredged channel where she probably could not have navigated because of insufficient water. Finally, the angle of collision proves that it could not have occurred close to the eastern edge of the channel. This is so because a ship's change of heading before she leaves her course under a hard-over helm is considerably less than 40 degrees. The Bruce was therefore at fault, even though she was on her own side of the center of the channel, as we think she was, when she accepted the passing signal, because she did not co-operate by putting her rudder right and giving the San Vincente more room. The latter was also at fault. In putting her rudder easy left to allow the Maryland to pass, she got into the Bruce's side of the channel, and she certainly did not get back to her own side as soon as she could and should. This is shown by her log. The "easy left" helm was followed by "steady" for one minute, "easy right" for two minutes, "easy" for one minute, "right" for one minute, and "hard right" for one minute, then "collision." She was also at fault in keeping on at full speed after the Bruce's alarm. She was endeavoring to cross the Bruce's bow, a maneuver which, even if sometimes justifiable in an emergency, cannot be so justified here, for she did not put her rudder hard right until half a minute after the alarm. If, as we believe, the collision occurred somewhere near the center of the channel, the place where the vessels came to rest can be accounted for by the speed of the San Vincente for two minutes after they were locked together.
Since both vessels were at fault, we must consider the questions raised by the assignments of error of owners of cargo on the San Vincente. The bills of lading contained a "both to blame collision" clause, reading as follows: "If the shipowner shall have exercised due diligence to make the ship seaworthy and properly manned, equipped and supplied, it is hereby agreed that in the event of the ship coming into collision with another ship as a result of negligent navigation of both ships, the owners of the cargo carried under this bill of lading will indemnify the shipowner against all liability to the other ship or her owners in so far as such liability represents loss, damage or claim of said cargo paid or payable by the other ship or her owners, and set off, recouped or recovered by the other ship or her owners as part of their claim against the carrying ship or shipowner." The validity of this clause was attacked by exceptions to the San Vincente's petition vouching in the cargo libellants. These exceptions were overruled by Judge Abruzzo in advance of the trial. His opinion is reported in The W. W. Bruce, D.C., 14 F. Supp. 894. Since the liability of cargo to indemnify the carrying vessel is conditioned upon the shipowner's exercise of due diligence to make the ship seaworthy, the first question to be considered is the seaworthiness of the San Vincente. As to this the District Court had no occasion to make any finding, since only the Bruce was held at fault.
Unseaworthiness is asserted by the cargo interests on the ground that the vessel was not supplied with adequate data for proper navigation of Craighill Channel. In 1932 the buoys marking this channel were renumbered and Notices to Mariners, Nos. 15 and 23, issued in April and June, respectively, of 1932, gave warning of the renumbering. The San Vincente, however, when she began her voyage at Portland, Or., on August 30, 1934, and when she left Baltimore on October 13th, two hours before the collision, was still using an old chart which had not been corrected to show the new numbering of the buoys, although there is testimony that Notice No. 23 had been pasted on the chart prior to breaking ground at Portland. Of this more will be said hereafter. In August, 1934, several of the buoys marking Craighill Channel had been temporarily shifted while dredging was going on, and Notice to Mariners No. 36 dated September 5, 1934, gave warning of the changes of location. There is a dispute whether a copy of Notice No. 36 was received on board at the port of San Pedro, September 20, 1934. We shall assume that it was; but, since this notice referred to the buoys by their new numbers, it would be meaningless to a navigator not aware of their renumbering in 1932. Hence the vital issue of fact is whether Notice No. 23 was on board. If *837 it were, then the failure to correct the numbering of the buoys on the chart might be evidence of a fault in navigation or management rather than unseaworthiness. U. S. Steel Products Co. v. American & Foreign Ins. Co., 2 Cir., 82 F.2d 752.
Second Officer Frey testified by deposition in July, 1936. He was shown a photostatic copy of Notice No. 23 and testified that "this was pasted on the margin of the chart and the ship was being navigated by it at the time of the collision, this notice." He explained further that "that was on there before I came aboard"  as, of course, it should have been, since he did not join the ship until August, 1934. If Frey's testimony were correct, it seems incredible that Capt. Read would not have known that this notice was pasted on the chart. Frey testified that after the collision and before the hearing conducted by the Local Inspectors on October 31, 1934, Capt. Read had taken the chart from the chartroom. Had the notice been attached to it, Read could not possibly have been ignorant of the renumbering, when he was studying the chart prior to giving his testimony before the Inspectors. Nevertheless, in March, 1935, when Read first testified by deposition in the case at bar, he said that he first learned that the numbers had been changed when he put in his report to the local inspectors. He also said that so far as he knew no one on the ship knew of the renumbering or what the new numbers were, and that he did not remember ever having seen a copy of a Notice to Mariners concerning it. After the collision and after finding out that the buoys were wrongly numbered, Capt. Read obtained a new chart, and the one which had been in use was destroyed in accordance with the regular practice of destroying an old chart when a later one was obtained. Capt. Read explained that he did not realize the importance of keeping the old chart because the renumbering of the buoys had nothing to do with the collision. Consequently, the chart was not available when called for by the cargo interests during Frey's testimony. In August, 1936, Capt. Read again testified by deposition. On direct examination he contradicted his former testimony that he had not known until after the collision that the buoys were renumbered. He also stated that there were posters on the chart but he could not say what they were. Then on redirect he testified positively that Notice No. 15 had been cut out and pasted on the chart. It will be remembered that the notice Frey testified was pasted on the chart was No. 23. If either notice were actually attached to the chart, it is most remarkable that the log entry made by the first and third officers and signed by them and the captain shortly after the collision should have used the old numbers to locate the place in the channel where the ship was grounded. First Officer Ford, in testifying in March, 1935, regarding the making of the log entry, explained that he knew the buoys had been changed but that he did not use the correct numbers "because that was the number that the chart was"; and "we found out afterwards that we were wrong."
The burden of proving the exercise of due diligence to make the ship seaworthy is upon the owner, when rights are asserted under the both-to-blame collision clause, no less than when immunity is asserted under the Harter Act, 46 U.S.C.A. § 190 et seq. The Wildcroft, 201 U.S. 378, 26 S.Ct. 467, 50 L.Ed. 794; May v. Hamburg-Amerikanische Packetfahrt, 290 U.S. 333, 341, note 1, 54 S.Ct. 162, 163, 78 L.Ed. 348; The Nordpol, 2 Cir., 84 F.2d 3; The West Arrow, 2 Cir., 80 F.2d 853. Nor is it material, if unseaworthiness exists, that it has no causal relation to the catastrophe. May v. Hamburg-Amerikanische Packetfahrt, supra. The owner of the San Vincente has failed to carry the burden of convincing us that the vessel was equipped with adequate navigational data for Craighill Channel. The numerous contradictions in Capt. Read's testimony make the statements contained in his first deposition more persuasive than his attempted retractions after Frey's testimony. The latter's statement that Notice No. 23 was attached to the chart is refuted by the log entry and by Capt. Read's first testimony. Even if no adverse inference be drawn from the destruction of the chart, its absence leaves the proof dependent upon conflicting oral testimony insufficient to carry persuasion. Accordingly, we find that the owner has not proved the ship seaworthy with respect to the chart. See The Maria, 4 Cir., 91 F.2d 819; U. S. Steel Products Co. v. American & Foreign Ins. Co., 2 Cir., 82 F.2d 752; The Maria, 15 F. Supp. 745, D.C., S.D.N.Y.
This renders it unnecessary to consider the much debated legal question as to the validity of the both-to-blame collision clause.
The decree is modified to hold both vessels at fault.

*838 On Petition for Rehearing.
W. H. McGrann, of New York City, for petitioner.
PER CURIAM.
The owners of the San Vincente have petitioned for a rehearing with respect to her seaworthiness. The gist of their petition is that, although notice No. 23, which gave warning of the renumbering of the buoys, was not on board, nevertheless there was available material from which the navigating officers could have discovered what the proper numbering was. Attention is directed to testimony to the effect that 1934 light lists were aboard. The argument is that notice No. 36, giving warning of the temporary change in location of the buoys, mentions buoy 11 C; that by referring to the chart in use the navigating officer would discover that no such buoy appeared on the chart and would realize the buoys had been renumbered; that he would then refer to Atlantic Coast Light List of 1934 and, finding no such number there because buoy 11 C was unlighted, he would turn to the local light and buoy list and its supplement, would thus discover the location of said buoy, and, by again referring to the chart, would learn that old number 7 C was now numbered 11 C, and, inasmuch as the buoys, by statutory provision, are always numbered consecutively, he would be able to figure out the new numbering of all the buoys. Having done this, notice No. 36 would no longer be meaningless. Hence it is concluded that the San Vincente was fully equipped with sufficient information for safe navigation of Craighill Channel, and any failure to use the available information was a fault in navigation or management, not a defect in seaworthiness.
The doctrine of U. S. Steel Products Co. v. American & Foreign Ins. Co., 2 Cir., 82 F.2d 752, cannot be pushed so far. It was there held that, since notices giving warning of the new light were ready for immediate use in correcting chart and light book, the vessel was not unseaworthy because such corrections had not been made when the voyage began. But in the case at bar the means for immediate correction of the chart were not ready at hand; to make the corrections would require investigation of material other than the chart and the notice, the deducing of conclusions not directly stated in any of the documents examined, and the piecing together of the information so obtained. We do not think an owner performs his duty of due diligence to equip his vessel for safe navigation if the master is required to go through such a process of investigation and reasoning in order to obtain the necessary navigational information. Accordingly we adhere to our former opinion. The petition for rehearing is denied.