**ULSTER OIL TRANSPORT CORP. et al.
v. THE MATTON NO. 20 et al.**

**THE PETROLEUM NO. 7.**

**THE CARUTICA.**

No. 18036.

United States District Court,
E. D. of New York.

Jan. 19, 1953.

Macklin, Speer, Hanan & McKernan, New York City, by Martin J. McHugh, New York City, for libellants.

Mahar & Mason, New York City, by Frank C. Mason, New York City, for claimant, The Matton No. 20.

Galli & Locker, New York City, by Warner Pyne, New York City, Vincent J. Ryan, Babylon, for claimant, The Carutica.

GALSTON, District Judge.

This action is brought to recover damages to a steel tank barge, The Petroleum No. 7, and also to recover damages for loss of some of the cargo of fuel oil. The barge was in tow of the tug Matton No. 20, and was proceeding west in the barge canal between Locks 12 and 13. The Carutica, a grain-carrying vessel made up of three sections which were navigated as a unit, was proceeding east. A collision resulted in the damage complained of by the libellants.

It was agreed by the respondents that the libellants sustained damages to both the barge and cargo, and that they are entitled to a decree. There remains, therefore, for decision the question of which one of the respondents was liable, or whether both were.

582

On October 4, 1947, at about 9:00 P. M. a collision occurred between the port bow corner of the barge Petroleum No. 7 and the port after side of the first section of the Carutica unit, and then with the port bow corner of the second section of that unit, in the Mohawk River of the New York State Barge Canal, about one mile west of Lock 12.

At the place of collision the channel was marked with red lighted buoys on the starboard hand, and white lighted buoys on the port hand for west bound vessels. The channel width between the buoys is about 300 feet. The distance from bank to bank is about 375 feet. The tug Matton was pushing in the usual fashion the oil barge Petroleum No. 7. The tug was made up to the barge with the stem of the tug against the middle of the stern of the barge, and with cables extending from the corners of the barge to the side of the tug, so as to make a stiff tow.

The Matton and her barge were of a total length of 277.8 feet. The beam of the tug was about 20 feet and the barge 40.5 feet.

The Carutica was 296.9 feet in length and 43½ feet in beam.

It appears that some time shortly after 9 P. M. the master on The Matton observed the lights of a flotilla approaching from the opposite direction just at a time when he was about to blow a bend signal. At that time he heard a bend signal from the approaching flotilla. The Matton blew a one-whistle passing signal, which was immediately answered by a similar signal. Thus a port to port passage was agreed upon.

After the exchange of these passing signals the captain of The Matton observed The Carutica as she was coming around the bend, apparently not breaking around the bend but cutting the bend short. The Matton had slowed down, her wheel put to starboard to get towards the bank. As The Matton passed Red Buoy No. 258, The Matton was from 20 to 25 feet to the starboard of that buoy, which in itself was about 50 feet off the shore-line. It should be noted that at the time The Matton observed The Carutica The Matton's rudder was hard starboard, and the testimony is that she was at half speed in order to maintain the starboard bend safely. Her wheel was kept in that position to the time of collision.

Apparently The Carutica unit did not hold to its own starboard side, and the contention of those on The Matton is that The Carutica was on the wrong side of the channel.

Contrariwise The Carutica claims that at the time the vessels sighted each other The Carutica was making a speed of about 2 miles an hour. (At this time The Matton and her tow were making about 1½ miles an hour.) It is the contention of The Carutica that when the vessels exchanged passing signals, both The Matton and The Carutica were proceeding in about the center of the buoyed channel. The Carutica claims after the exchange of one-whistle signals she altered her course to starboard in an effort to haul over from midchannel to her own starboard side of the channel. The altered course of The Carutica was not sufficient to avoid a collision. The collision occurred between the port bow corner of the barge Petroleum No. 7, first with the port after side of the first section of The Carutica, and afterwards hitting that side with the port bow corner of the second cargo section of The Carutica.

What fault or faults led to this collision is the critical question in the action. At the time of collision it is conceded that both The Matton and The Carutica carried all required running and other lights. The weather was not a factor, because it was a clear, dark night, with no appreciable wind, and the easterly current of the river about ⅛ of a mile per hour. The place of collision is an important factor in this case, to be considered in determining fault. Roberts, the master of The Matton, testified that at the time of collision the starboard side of The Petroleum No. 7 was about 70 feet from its own starboard bank, and that he had passed off Buoy No. 258, which itself was 50 feet from the shore, at a distance of from 20 to 25 feet. Roberts said that the collision occurred about 400 or 500 feet beyond

Buoy No. 258 on his starboard edge of the channel. After the collision, a line 120 feet in length was doubled, and ran to a tree on the starboard bank to hold the flotillas in position, and made fast about midship on The Petroleum No. 7 on its starboard side.

Roberts' testimony as to the place of collision was in a measure corroborated by Nelson, the master of The Petroleum No. 7. Nelson said the collision occurred about 70 feet from the starboard bank of The Petroleum No. 7, at a distance of about 20 feet from Buoy No. 258. Gibbs, an engineer of The Matton, who came out of the galley immediately after the impact, with a rough estimate placed the shore-line from 50 to 60 feet off on the starboard side. Powers, the cook of The Matton, estimated that distance also at from 40 to 60 feet.

Wimette, the captain of The Carutica, said that the bow of The Petroleum No. 7 was about 30 or 40 feet from the Red Buoy No. 260. On cross-examination, he said that it was the middle bow of The Petroleum No. 7 which was at that distance from the buoy. The barge was about 40 feet in width, so that the starboard bow corner of The Petroleum No. 7 would figure to be at from 10 to 20 feet from Red Buoy No. 260.

It seems reasonably clear that The Carutica was at a point about 10 to 20 feet from the channel edge on The Matton's side of the river. The apparent fault then of The Carutica was in failing to proceed on her own starboard side of the channel.

The Carutica, on the other hand, alleges fault on the part of The Matton. The argument is that there were violations by The Matton of the statutory rules of the road, the Inland Rules and the Coast Guard Rules.

It is urged that The Matton failed to blow a bend signal as required by Inland Rule, Article 18–V, which provides:

"Whenever a steam vessel is nearing a short bend or curve, in the channel, where, from the height of the banks or other cause, a steam vessel approaching from the opposite direction can not be seen for a distance of half a mile, such steam vessel, when she shall have arrived within half a mile of such curve, or bend, shall give a signal by one long blast of the steam whistle, which signal shall be answered by a similar blast, given by any approaching steam vessel that may be within hearing. Should such signal be so answered by a steam vessel upon the farther side of such bend, then the usual signals for meeting and passing shall immediately be given and answered; but, if the first alarm signal of such vessel be not answered, she is to consider the channel clear and govern herself accordingly." 33 U.S.C.A. § 203.

Pilot Rule 80.5 provides:

"Vessels nearing bend or curve in channel; * * * Whenever a steam vessel is nearing a short bend or curve in the channel, where, from the height of the banks or other cause, a steam vessel approaching from the opposite direction cannot be seen for a distance of half a mile, such steam vessel, when she shall have arrived within half a mile of such curve or bend, shall give a signal by one long blast of the steam whistle, which signal shall be answered by a similar blast, given by any approaching steam vessel that may be within hearing. Should such signal be so answered by a steam vessel upon the farther side of such bend, then the usual signals for meeting and passing shall immediately be given and answered; but, if the first alarm signal of such vessel be not answered, she is to consider the channel clear and govern herself accordingly. * * *"

Pilot Rule 80.03 provides:

"Signals.—The whistle signals provided in the rules in this part shall be sounded on an efficient whistle or siren sounded by steam or by some substitute for steam.

"A short blast of the whistle shall mean a blast of about one second's duration.

"A prolonged blast of the whistle shall mean a blast of from 4 to 6 seconds' duration. * * *"

Captain Roberts of The Matton conceded that the tug blew no bend signal. He said he was just about to blow such a signal when he heard a one-blast signal from The Carutica. This apparently was a bend signal. Roberts then blew a one-whistle passing signal, which, he said, was immediately answered with a one-whistle signal, thus agreeing upon a port to port passage. Roberts said that as his vessel approached the bend, his visibility was about 800 feet ahead, and that the distance between the forward end of The Petroleum No. 7 and the forward end of The Carutica, when first he sighted The Carutica, was about 700 feet. From the statutory rules quoted, a bend signal is required to be blown a half mile from the bend, which is, of course, a good deal more than the 800 feet visibility ahead around the bend as estimated by Captain Roberts. Thus if there was a violation by him in failing to give a bend signal when approximately a half mile from the bend, our inquiry must be whether that failure contributed to the happening of the collision. The captain of The Carutica testified that when he sighted The Petroleum No. 7, the distance between the two was from 1800 to 2000 feet. It is reasonable to infer that if The Matton had followed the rules of the road and given the bend signal when a half a mile away from the bend, it may have alerted The Carutica at a time when the distance between the two oncoming vessels was a good deal more than that testified to by Roberts. In that event it is within the realm of possibility, but by no means established, that an exchange of passing signals thereafter could have been accomplished with each vessel keeping to its side of the road. In that field of speculation, however, the fact that The Carutica was on the wrong side of the channel cannot be ignored.

With respect to The Matton's failure to blow a danger signal, such a signal is required to be given if "when steam vessels are approaching each other, either vessel fails to understand the course or intention of the other, from any cause". Art. 18, Rule III, Navigation Rules for Harbors, Rivers and Inland Waters, 33 U.S.C.A. § 203. A port to port passage had been agreed on between the vessels by proper whistle signals, and there is no indication that The Matton did not understand the signals. Moreover, when Captain Roberts first became aware of the danger of a possible collision, The Carutica was, according to Captain Wimette's testimony, backing her main engines to kill headway. This maneuver would appear to be the most reasonable one for The Carutica to have attempted under the circumstances. Therefore blowing a danger signal probably would not have resulted in any different action from that taken.

■ Concededly The Matton had no lookout, either on the tug or on the forward or bow end of The Petroleum No. 7. The rule has been stated that the failure to have a lookout is a statutory fault for which a vessel must be held unless it is clear that this failure neither did, nor could have contributed to cause the collision. The Pennsylvania, 19 Wall. 125, 22 L.Ed. 148; Gulf Oil Corporation v. The Socony No. 16, 2 Cir., 162 F.2d 869.

■ According to Roberts, he first realized the possibility of danger when The Carutica's green light broke out. The interval between the time when he first saw The Carutica and the time he saw its green light was not more than a minute. It has been noted that he placed the flotillas as being 800 feet apart when he first sighted The Carutica. The Matton's engine was at half speed, or at about 1½ miles per hour. The Carutica's main engine was stopped, according to its captain, when it blew its one-whistle signal.

Taking into consideration the speeds at which they were approaching, the flotillas would then have been at least 500 feet apart at a point in time not more than one minute after Roberts first sighted The Carutica.

On redirect examination, Roberts placed the bow of The Petroleum No. 7 as not being over 150 to 200 feet from The Carutica when the latter's green light broke out. He also testified that to kill all headway on The Matton and The Petroleum No. 7, and bring the vessels dead in the

water by reversing the engine when the tug was going ahead at half speed, would have required two lengths of the barge, or around 400 feet.

In explaining his action in keeping his tug at half speed with a hard starboard wheel to swing to his starboard, Captain Roberts testified that in view of the closeness of the vessels at the time he realized there was danger, he believed there was a possibility that the two flotillas would slide along each other and not do any damage; and that if he had reversed his engine, the swing to starboard, although it would continue, would not be as fast. It is contended that this action of The Matton, if it was error, was a mere error in judgment at the moment of emergency. There is some justification for accepting this contention if the barges were only 200 feet apart when Roberts first realized there was danger of a collision. It should be noted, however, that it was 9:00 o'clock at night ·and dark, and that Roberts, in the pilot house of The Matton, was over 200 feet astern of the bow of The Petroleum No. 7. The question then arises whether a lookout stationed at the bow of The Petroleum No. 7 could not have reported the danger sooner, so that the alternative possibility of avoiding a collision by stopping or reversing the engine of The Matton would still have been open for consideration by its captain.

The evidence presented by the respondent, Matton Steamboat Company, Inc., does not warrant the inference that even in the presence of a lookout such an alternative could not or did not exist. Matton's failure to sustain the burden of showing that the fault in not having a lookout could not have contributed to the collision requires the conclusion that The Matton is also liable. Port Line Ltd. v. United States, 2 Cir., 181 F.2d 355, 357; Ira S. Bushey & Sons v. United States, 2 Cir., 172 F.2d 447; The Madison, 2 Cir., 250 F. 850.

In view of the foregoing both The Carutica and The Matton are at fault, and the libellant may have a decree accordingly.

Appropriate findings of fact and conclusions of law will be filed with this opinion.