**UNITED STATES**

v.

**WESSEL DUVAL & CO., Inc. and four other cases.**

**THE EDWARD RUTLEDGE.**

United States District Court
S. D. New York.

July 26, 1954.

As Amended Sept. 17, 1954.

J. Edward Lumbard, U. S. Atty., New York City, for libelant Ruth Kearney and Louis F. Greco, New York City, of counsel.

Stanley W. Schaefer and William M. Kimball, New York City, for respondent.

RYAN, District Judge.

Five separate suits in the admiralty were consolidated for trial and it was stipulated that the evidence received would be the record of the trial of each of these suits.

All the claims alleged in these suits arose from the operation of the S. S. Edward Rutledge during the period the vessel was under bareboat charter by her owner the United States Maritime Commission to Wessel, Duval & Co., Inc., a New York corporation.

The Edward Rutledge is a Liberty ship, registered in 1942 at Wilmington, North Carolina. She is a dry cargo vessel, of steel construction, two decks, 422 feet long, 57 feet broad, 35 feet deep; 7,177 gross tons, 4,375 net tons and 10,-550 tons dead weight capacity. The vessel was under bareboat charter to Wessel Duval under Contract No. MCc–41846 and Addenda 1–13 from June 3, 1947 until she was redelivered in September 23, 1949. Shortly thereafter the vessel was laid up at Mobile, Alabama.

Wessel Duval time chartered The Edward Rutledge to the United States De-

partment of the Army under three separate contracts:

Contract No. w–16–048tc410 in effect from January 19, 1948 to September 18, 1948;

Contract No. w–16–048tc557 in effect from September 19, 1948 to May 17, 1949;

Contract No. w–16–048tc642 in effect from May 18, 1949 to September 14, 1949.

This last contract was not operative from June 14, 1949 to July 1, 1949 when the vessel was used by the United States Department of the Navy. The vessel was redelivered under the time charter to Wessel Duval in September, 1949.

On January 16, 1948 shipping articles were signed for a voyage of The Edward Rutledge from Mobile, Alabama to European ports via Cuba and return. The vessel then proceeded from Mobile to Cardenas, Cuba where she was delivered to the United States Department of the Army under time charter No. w–16–048-tc410 on January 19, 1948. During the period from August 5, 1947 to the date of departure from Mobile the vessel had been in United States ports the following times:

August 5–August 13, 1947—Mobile, Ala.
October 4–October 10, 1947—Mobile, Ala.
October 11–October 14, 1947—Pensacola, Fla.
January 7–January 17, 1948—Mobile, Ala.

At Cardenas a cargo of sugar was loaded for carriage to Germany. After the loading and on January 26, 1948 while undocking The Edward Rutledge stranded in soft mud. She was departing for Havana, she had pilots aboard; lines were cast off the dock at 5:18 p. m.; five minutes later she was clear of the dock; at 5:30 p. m. she was aground in soft mud. There were no tugs available; lines were run to the dock with the assistance of a launch and by heaving on the lines she was pulled off the mud and moored alongside the dock. She waited for daylight as there was no night navigation out of the harbor. The water was not deep enough to permit examination of her bottom by a diver, but from such inspection as could be made under the circumstances it was determined that the vessel was safe and seaworthy to proceed to Havana. The following morning— January 27 at 7:44 a. m.,—she was again undocked and put on slow astern; a line fouled her propeller and the engine was stopped. At 8:52 a. m. the vessel was put on full ahead, at 9:01 a. m. she was on full speed astern on the telegraph but the engine went ahead; the order was repeated on the telegraph, and at 9:03 a. m. the vessel again went aground on soft mud, this time forward and the engines were stopped. Again, a launch was employed to take lines ashore to the dock but efforts to free her and get her afloat through the use of lines and the engine were not successful. The Master decided to wait until the tide came in; at 6:25 p. m. lines were again sent to the dock and finally at 9:45 p. m. the vessel was afloat and anchored for the night; a survey of her then made found her fit to proceed. At last on January 28, 1948 at 7:20 a. m. the vessel departed for Havana arriving at 5:45 p. m. the same day.

At Havana a diver removed parts and pieces of a line from the propeller and after examination of her bottom while she lay in water and after survey an underwriter's certificate of seaworthiness issued subject to dry dock at the owner's earliest convenience. After completing the loading of her cargo at Havana the vessel departed on February 5, 1948 to Germany. The cargo was discharged at Bremerhaven, and before she departed for Cuba and while at Bremerhaven she was surveyed on March 1, and 2, 1948 and given a further underwriter's seaworthy certificate. En route, instructions were received to proceed to Santiago, Cuba and she arrived there on March 26, 1948.

On the return voyage the Rutledge on approaching Santiago passed to the west of Hogsty Reef and navigated using Chart 0948.

At Santiago, she loaded 60,000 bags of sugar which were received on board in good order and condition; the loading was completed at 4:10 p. m. on Saturday, April 10, 1948. The vessel had cleared for Kingston, Jamaica for bunkers and thence to Germany where the sugar cargo was to be discharged; this was voyage No. 4 of the vessel under the bareboat charter to Wessel Duval.

Before she sailed from Santiago and about 8:10 p. m., April 10, the Chief Officer William Noll dropped dead. After the Master had made arrangements for proper disposition of the body and the the effects of the deceased, the vessel sailed at 1:47 a. m. Sunday morning— April 11—for Kingston without having obtained a replacement for the dead mate. She secured to the oil dock at Kingston at 11:50 a. m., April 12, completed bunkering at 7:20 p. m., cast off at 9:35 p. m., dropped her pilot and departed for Germany at 11:05, p. m., on April 12, 1948. The next morning at about 5, nine stowaways were found on board; she returned to Kingston, landed the stowaways and finally sailed at 1:15 p. m. on April 13, 1948.

The Edward Rutledge, delayed by her return to Kingston, was obliged to navigate through a large part of the Bahamas at night instead of going through in daylight. The Master had laid the course from Kingston to pass to the east of Hogsty Reef and out through Caicos Passage. The night was dark and clear, the moon obscured by clouds, the sea moderate, wind force around 4 or 5. A bearing was taken at 9:15 p. m. on April 14, at Southwest Point and from then on the vessel proceeded by dead reckoning. The projected course of The Edward Rutledge would have brought her close enough to the location of Hogsty Reef Light to have enabled those on board to see the light if it had been functioning. She was being navigated on the theory that Hogsty Reef Light was lighted; in fact it had been discontinued on July 27, 1947.

The Edward Rutledge went aground on Hogsty Reef at 2/08 a. m. on April 15, 1948. After the stranding the vessel and her cargo were salved by Merritt, Chapman Scott Corp. and Merritt Chapman Lindsay, Ltd.; 7,826 bags of the sugar cargo were necessarily jettisoned in the operation. The vessel after being salved was obliged to put back to Havana, and although she had been pulled off Hogsty Reef was able to proceed to Havana under her own power. There, after underwriter's survey and on surveyor's recommendation temporary repairs were made. On May 5, 1948 The Edward Rutledge was given an underwriter's certificate of seaworthiness to proceed to Germany. The United States loaded the vessel while she was being repaired with about 9,046 bags of sugar to replace those which had been jettisoned. She left Havana for Germany on May 6, 1948. Shortly after leaving port her condenser lost vacuum and she put back to Havana. She again set sail on May 11, 1948 for Germany with a further underwriter's certificate of seaworthiness given her that day. She finally arrived at Bremerhaven on June 2, 1948, and while her cargo was being discharged she was surveyed and granted an underwriter's certificate of seaworthiness to depart for New York with a partial cargo.

The remainder of the vessel's service under the time charters to the United States appears to have been uneventful insofar as it gave rise to the claims asserted in these five suits, save only that in November, 1948 at Seattle, Washington, the holds of the vessel were cleaned, and that a claim for charter hire has been made by Wessel Duval for the period July 9, 1948 to August 12, 1948 when the vessel was laid up for repairs occasioned by the Hogsty Reef stranding and the additional "fringe" claims hereinafter referred to.

It is from the foregoing that the litigation now before us flows.

The first of these suits was filed by— (1) *Merritt-Chapman & Scott Corpo-*

*ration, Libelant v. United States and Wessel, Duval & Co., Inc., Respondents, United States, Respondent-Impleaded, Wessel, Duval & Co., Inc., Respondent-Impleaded. (A. 163–394). And, (2) Merritt-Chapman Lindsay, Ltd., v. United States of America and Wessel, Duval & Co., Inc., United States of America, Respondent-Impleaded. (A. 164–153).*

These libels were filed against the United States as the owner of the cargo and against Wessel Duval as bareboat charterers of The Edward Rutledge, claiming award for salvage services rendered the vessel in freeing her from Hogsty Reef.

Apparently the Merritt-Chapman interests had some doubt as to which of their companies would be a proper libelant; they filed two separate suits as a protective measure. However, the reasons which prompted the separate suits are now immaterial; the claims of both Merritt-Chapman companies have been settled and they are no longer interested parties. The pleadings and the decrees of settlement in both are parallel.

The settlement was based on the proportionate values shown in the General Average statement, the United States contributing $44,779 and Wessel Duval contributing $25,221 to the total settlement amount of $70,000. In the final decree setting forth the settlement and by stipulation the United States and Wessel Duval expressly reserved their rights against each other to await the determination of liability with respect to the Hogsty stranding.

The stipulation provided:

"5. This stipulation is without prejudice to the right of either party to contend as per its pleadings, in any of the five suits listed above, that the other party's share of the total salvage award agreed to at $70,000. was larger than the amount the other party has by this stipulation agreed to pay.

"6. This stipulation is also without prejudice to the right of the United States of America to contend in any of the five suits listed above, that it is relieved from liability to contribute in general average because of the unseaworthiness of the Edward Rutledge."

Each of the respondents answered admitting liability for salvage and requesting the court to fix the amount. Each respondent petitioned under the 56th Rule, 28 U.S.C.A.; Wessel Duval in substance praying that the United States should contribute in general average for its share of the salvage award, and the United States praying that Wessel Duval should pay or reimburse the United States for the amount of salvage the United States is required to pay. It appears that these two suits filed by the Merritt-Chapman companies now have pertinence solely as to the question of the liability over of the respondents one to the other; and these claims over are asserted in the other suits.

(3) *Wessel, Duval & Co. Inc. v. United States of America, (A. 165–223).*

Following redelivery under the bareboat charter in September, 1949 and after the United States put the vessel in the laid-up fleet at Mobile, this suit in rem was started in Alabama where the ship was then. The suit was removed to the Southern District of New York.

In this suit Wessel Duval seeks recovery for general average contribution in the Hogsty Reef Stranding. Particularly, Wessel Duval asserts:

(a) Claim for contribution toward general average expenses of salvage expenses, sacrifices of hull, jettisoning of cargo;

(b) Indemnity to the extent of Wessel Duval's general average liability for the salvage services;

(c) Indemnity to the extent of Wessel Duval's liability for pending freight.

The United States has pleaded as a—

*First Defense*—

(a) General denial;

(b) That the stranding and expenses incurred by reason thereof were due to:

(1) unseaworthiness;

(2) improper manning, equipping and and supplying;

(3) breaches of time charter; and as a—

*Second Defense—*

(c) That the stranding was due to breaches of contract on the part of Wessel Duval;

(d) that the United States is entitled to set off, recoup or recover any amount which it may be required to pay Wessel Duval and all damages and expenses incurred by the United States as a result of said stranding.

(4) *United States of America v. Wessel, Duval & Co., Inc. (A. 169–342).*

Following the filing of libel (A. 165–223), the United States filed suit against Wessel Duval—A. 169–342. The libel alleges three separate causes of action. The first seeks recovery for alleged breach of the time charter w–16–048tc410 predicated on claims of failure of Wessel Duval to put the vessel in a seaworthy condition or to use due diligence to do so, resulting in the Hogsty Reef stranding, occasioning thereby cargo loss, expense to salvage and protect cargo, loss of use of the vessel and other damage. Specifically, the damages claimed are:

(a) the loss of sugar jettisoned; (b) causing the United States to be liable for salvage service; (c) causing the United States to incur loss and expenses in preserving cargo after the strand; (d) causing loss of the use of the vessel to the United States.

In the second cause of action the United States claims that the stranding was a general average situation and that Wessel Duval is required to contribute in general average and sues for that contribution. The third cause of action which was added by amendment allowed on trial alleges that the foregoing recited alleged failures of Wessel Duval constituted egregious fault and such variation from the terms of the contract as to amount to deviation.

The answer in substance (a) denies the first cause of action; (b) admits that a general average occurred and joins with the libelant in requesting a general average statement be made; (c) defends on the ground that due diligence was used to make seaworthy; (d) defends on the ground that the loss, if any, was caused by errors of navigation; (e) affirmatively defends on the ground that the one-year statute of limitation of the Carriage of Goods by Sea Act, 46 U.S. C.A. § 1300 et seq., bars the first cause of action; (f) as a setoff (also denominated counterclaim) seeks damages from the United States for failure to pay hire, for failure to return the vessel in like good order and condition, and for failure to contribute in general average following the stranding at Cardenas; (g) pleads the provisions of Article 12c of the Charter Party under which the United States in substance contracts to pay hire for loss of time provided Wessel Duval on request transferred to the United States such claims as Wessel Duval may have as against persons causing the loss; (h) joins with the United States in its request for general average; (i) pleads limitation of liability; and (j) for a further setoff (also denominated counterclaim) pleads that the United States has failed to pay further charter hire.

(5) *Wessel, Duval & Co., Inc. v. United States of America (A. 172–156).*

Wessel Duval then filed a cross-libel against the United States, and therein asserted claims for:

(a) failure of the United States to pay charter hire for the vessel;

(b) failure to return the vessel in like good order and condition;

(c) claim for cleaning holds on or about November, 1948, at Seattle, Washington (this amendment was allowed on trial);

(d) claim for general average contribution in connection with the grounding of the vessel at Cardenas.

In the first cause of action it is alleged that the claims pleaded in this cross-libel came within the disputes clause (Article 24 of the Charter Party); that the Unit-

ed States waived the disputes clause by filing suit and that Wessel Duval was prevented from instituting suit on the contract until September 4, 1951, when the United States instituted suit against Wessel Duval by filing suit numbered (4) above (A. 169–342). For a second cause of action Wessel Duval pleads that under Article 12c of the Charter Party the United States is obliged to pay hire when the vessel is detained provided Wessel Duval will assign to the United States its claim against any third party causing the detention and that the United States is obliged to indemnify Wessel Duval.

The United States answers (a) with a general denial, (b) pleads the disputes clause as a complete defense, (c) pleads the statute of limitations under the Admiralty Act and Public Vessels Act, 46 U.S.C.A. § 781 et seq., and (d) pleads as a partial defense (also denominated counterclaim) the cost of discharging sand ballast from the vessel.

Prior to trial, motions addressed to the pleadings in A. 169–342 and A. 172–156 came on to be heard before Judge Dimock. His decision is reported at D.C., 115 F.Supp. 678.

It is to be noted that in United States v. Wessel Duval (A. 169–342) the amended answer sets off claims for breach of contract by the United States in failing to contribute in general average as a result of the stranding at Cardenas and in failing to return the vessel at the end of the time charter in like good order and condition and to pay charter hire, and that these same claims are alleged in the amended cross-libel filed by Wessel Duval v. United States (A. 172–156), as the basis for affirmative recovery against the government. This duplication of pleading was brought about no doubt by belief of the proctors for Wessel Duval that a counterclaim may not be set up in an answer. See Local Admiralty Rule 16, but see Sup.Ct.Admiralty Rule 50, 28 U.S.C.A.

■■■■ Judge Dimock held on motion to the exceptive allegations to the libel filed in A. 169–342 that the time charter incorporated the 1-year limitation of Section 3(6) of the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1303(6), so as to bar claims alleged for cargo loss or damage stated in the first cause of action of this libel. The judge further held that although the two-year Suits in Admiralty limitation, 46 U.S.C.A. § 745, barred Wessel Duval from affirmative recovery on its claims in A. 169–342 and A. 172–156, it might set off these claims against the United States. I accept and apply Judge Dimock's rulings as the law of the case.

Summarize the various claims, counterclaims and setoffs each party has asserted against the other in all five suits, we find as follows:

The United States makes claim for all general average expenses incurred by cargo, which amount to approximately $125,000, reimbursement of the $44,779 contribution toward the salvage award, charter hire paid during the periods the vessel was undergoing temporary and permanent repairs, amounting to approximately $50.000, and such other additional expenses which were occasioned by the stranding on Hogsty Reef. In addition the United States has a claim for $4,000 for expenses incurred by the Army Department in the discharge of sand ballast from the vessel.

Wessel Duval makes claim for contribution toward general average expenses and cargo's share. Wessel Duval also claims $60,000 for additional charter hire, general average expenses arising out of the Cardenas stranding, for cleaning holds on or about November, 1948 at Seattle and for failure to redeliver the vessel in good order and condition, reasonable wear and tear excepted.

At trial, it was conceded by the United States that the value of the vessel was $452,000 and that the claims of the United States did not exceed that amount. Wessel Duval with this concession on record withdrew the defense of limitation of liability it had pleaded.

Before consideration is given to the facts and the law applicable to the Hogsty Reef stranding and the two Cardenas strandings or to the diverse claims prof-

ferred by each of the litigants—called conveniently by the parties the "fringe claims", it is best to examine the time charters between Wessel Duval and the United States Department of the Army. They are the documents which state the rights and obligations of each of the remaining parties to these suits concerning the claims alleged.

First, it is to be noted that all the time charters were prepared by the United States Government on government forms and submitted to Wessel Duval for signature.

The delivery of the vessel to the United States at Cardenas on January 19, 1948 was pursuant to Art. 2(a) of the time charter. Redelivery by the United States to Wessel Duval was on September 7, 1949 at New York.

The claims of the United States for expenses incurred in discharging ballast from the Edward Rutledge are predicated on Art. 5 providing for delivery and notice as follows:

"(a) The vessel shall be delivered with hull, machinery and equipment in a thoroughly efficient state, as far as due diligence can make her so, at the port of delivery in such dock or at such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide), except as otherwise provided in Article 9(a), as the Charterer may direct. If such dock, wharf or place be not available time shall count as provided for in subparagraph (b) hereof. Vessel on her delivery shall be ready to receive cargo with clean-swept holds and, as far as due diligence can make her so, shall be tight, staunch, strong, and in every way fitted for the service, having water ballast, winches and donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same time, and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage."

These expenses were incurred while the vessel was at Santiago, Cuba, prior to the commencement of the second voyage under the time charter in April, 1948, three months after the vessel had been delivered to the Government pursuant to Art. 2(a). The question is whether under the time charter ballast is for the account of the owner—Wessel Duval—, or the time charterer—the United States—, under the terms of Art. 5 and of Art. 6 which defines the owner's obligation as follows:

"6(h) Nothing stated in this charter party is to be construed as a demise of the vessel to the Time Charterer, the Owner to remain responsible for the navigation of the vessel, insurance, crew and all other matters, same as when trading for their own account."

Wessel Duval's resistance to the claim of the United States for expenses in discharging ballast is in part based on that part of Art. 9(b) which provides that,

"If the Charterer (the United States) elects to remove dunnage and fittings placed aboard by the Charterer the cost of removal and discharge shall be borne by the Charterer."

This raises the question of whether the United States since it elected to send the vessel to Santiago in ballast must bear the cost of discharging it.

Similarly the claim of Wessel Duval for reimbursement of the expenses incurred in cleaning out the holds so that the vessel could carry grain after having carried coal as directed by the United States is predicated on that part of Art. 9(b) which provides that,

"All expenses of whatsoever nature and kind in connection with the loading and discharging of the cargo shall be for the account of the Charterer. * * * After proper delivery the Charterer (the United States) shall be responsible for cleaning the cargo compartments at Charterer's expense."

Wessel Duval's claim for charter hire for the period July 9, 1948 to August 12, 1948, the time during which the vessel was laid up for repairs occasioned by the Hogsty Reef stranding (which is conceded to be reasonable and necessary for the repairs made) depends upon whether the repairs were "ordinary" within the meaning of Art. 12(a)—the Off-hire clause of the charter—, and if not, if they were "extraordinary" repairs, whether under this article hire was payable for the period during which they were being made. Article 12(a) provides:

"In the event of loss of time in excess of 48 hours from deficiency of men or stores, fire, breakdown, or damages to hull, machinery or equipment, grounding, detention by average accidents to ship or cargo or by any other cause preventing the full working of the vessel in port or at sea the rate of hire for the time in excess of 48 hours thereby lost shall be reduced to $1,000.00 per diem except that there shall be no reduction in hire for *any* time lost due to damages to vessel for which the Charterers are responsible and there shall be no reduction in hire for any time lost due to necessity of making repairs to the vessel at a foreign port for the sole purpose of making the vessel seaworthy, provided that in the event of any loss of time due to ordinary repair and maintenance work, including drydocking, performed by the Owner, at a United States port to maintain the vessel in good order and condition the time so lost shall be deducted from the hire."

Wessel Duval's additional claim for hire arising from the alleged failure of the United States to redeliver the vessel in good order and condition less reasonable wear and tear, making necessary repairs at the end of the charter period (September 7, 1949) falls within this same article. Likewise does its claim for indemnity from the United States for such losses it sustained by reason of the alleged failure of the United States to pay hire, should Art. 12(a) be construed as not entitling Wessel Duval to collect hire from the Government.

The claim of Wessel Duval for general average contribution toward salvage expenses and indemnity to the extent of its general average liability for salvage occasioned by the Hogsty Reef stranding is based on Articles 15, 17(a), 19 and 20 of the charter; so, too, the United States denial of liability for general average expenses, reimbursement of contribution toward the salvage award and other additional expense occasioned by the stranding. By Article 15, the parties mutually accepted loss or damage caused by errors in navigation; and by Art. 17(a) the charter incorporated the provisions of the Carriage of Goods by Sea Act (see opinion of Judge Dimock, supra). Section 4(2) (a) of the Act, 46 U.S.C.A. § 1304(2) (a) provides that in the absence of unseaworthiness neither the carrier (Wessel Duval) nor the ship shall be responsible for loss or damage arising or resulting from—

"(a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship".

Since there is no dispute regarding the applicability of the Carriage of Goods by Sea Act, the only question is whether the loss was due to unseaworthiness of the vessel or to errors in navigation or management.

The cross-libel of Wessel Duval claiming general average contribution in connection with the groundings of the vessel at Cardenas is founded on Art. 20—the "Amended Jason Clause"—which provides in substance that where there is damage "from any cause whatsoever, whether due to negligence or not, for which or for the consequence of which the Owner is not responsible by statute, contract or otherwise, the cargo, * * * shall contribute with the vessel and its Owner in General Average to the payment of any sacrifices, losses or expenses of a General Average nature * * * and shall pay salvage * * *."

The Government's contention that Wessel Duval's claims for charter hire, failure to redeliver in like good order and condition and for the cost of cleaning the holds are matters falling within the Disputes Clause is predicated on Art. 24:

"Except as otherwise specifically provided in this contract, all disputes concerning questions of fact which may arise under this contract, and which are not disposed of by mutual agreement, shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail a copy thereof to the Contractor at his address shown herein. Within 30 days from said mailing the Contractor may appeal in writing to the Secretary of War, whose written decision or that of his designated representative shall be final and conclusive upon the parties hereto."

While Wessel Duval does not dispute that these claims come within the Disputes Clause, it contends that the United States by filing suit waived its provisions.

The Cardenas Strandings

These strandings which occurred on January 26 and January 27, 1948 are recorded in the Bridge Log of the Edward Rutledge as follows:

Under date of January 26, 1948:
"17.23—Clear of dock.
17.30—Vessel aground. Nature of bottom soft mud.
17.43—Stop engines. Soundings taken. Starboard side forward 14 feet. Starboard No. 2 Hatch 16 feet. Starboard side No. 3 Hatch 19 feet. Port side lowest was 21 feet.
18.30—Launch Estella alongside and took stern line to dock.
20.00—Line on dock.
20.30—Stand by engine.
20.33—Half ahead, navigating as per bell book.
20.37—Vessel afloat.

21.05—Dropped starboard anchor, one shackle."

The draft of the vessel is noted in the log as:
"7. A.M. Forward 16–3; Aft. 19–1; Mean 17–08.
4. P.M. Forward 18.6; Aft. 18.6; Mean 18.6."

Under date of January 27, 1948:
"6.55—Pilot E. Clark aboard. Tug Cardinal alongside.
7.15—Stand by engine, taking in lines.
7.22—Slow ahead and navigating as per bell book.
7.32—Anchor up.
7.44—Slow astern. 2nd Mate Mr. Murray reported line in propeller. Stopped engines.
7.46—Let go starboard anchor one shackle in water.
8.52—Full ahead; all clear aft. Bells as per bell book.
9.00—Full astern on telegraph; engine went ahead; repeated full astern on telegraph, also notified engine room by phone.
9.03—Aground. Engine going astern.
9.12—Stop. Launch taking line ashore to dock.
9.38—Line on dock.
9.39—Full astern. Navigating bells as per bell book. Heaving on stern line.
10.21—Line parted and vessel lost 500 ft. of same. Said line was in good condition.
10.45—Line on dock. Slow ahead and navigating.
11.02—Line parted and vessel lost approximately 120 fathom of line. This line was practically new.
11.40—Tug Sirius pulling with stern line—Navigating bells on engine.
11.58—Line on dock; strain on both lines.

12.09—Stop, unable to move vessel; pilot and tugs left; line on dock taken aboard due to other vessel leaving dock. Soundings taken. Nature of bottom—soft mud

22.05—Line parted and vessel lost approximately 100 fathoms of same. Line was in good condition."

"P.M.

18.00—Pilots E. Clark and Benavidas on board.
18.25—Stern line on dock.
19.00—Bow line on dock.
21.26—Standby engine.
21.44—Full astern
21.45—Stop. vessel afloat
21.50—Dropped port anchor."

The weather entries in the log on January 27, 1948 noted at 4 A.M. "scattered clouds, easterly wind, force 2–3, barometer 30.03"; and at 8 A.M. and 12 N. "easterly wind, force 3"; at 4 P.M. "northeasterly wind, force 3"; at 8 P.M. "northerly wind, force 1."

The Master of the Edward Rutledge under date of January 30, 1948 sent two written reports of these Cardenas strandings (U.S.Exs. 15, 16). He reported that on January 26, 1948 the vessel's cargo of 75,877 bags of refined sugar weighed 3,421 tons, fuel on board was 9,173 bbls. and water, 250 tons; that the draft forward was 18′06″, aft 18′06″ and mean 18′06″. He recorded that "at the time the weather was clear with an east north east wind force two to three," and that "just a small launch for running lines to the dock" was employed. Diagram outlines of the hull of the vessel, which were attached to the reports, show what portions of the bottom of the vessel were grounded in the soft mud on each stranding at Cardenas. This diagram of January 26, 1948 shows that the starboard side forward of the vessel was caught in the mud; that the starboard forward quarter rested in 14 feet of water; that amidships, starboard, there were 16 feet of water; that the starboard aft quarter floated in 19 feet of water

and that her entire port side was riding free. The diagram of January 27, 1948 shows the stern of the vessel aground; the port forward quarter rested in 14 feet of water; the starboard forward quarter in 18 feet of water; and the rest of the vessel was riding free.

■ It was conceded by the Government on trial that the strandings at Cardenas were occasioned by reason of faulty navigation and were not due to unseaworthiness in any respect. I have pointed out that Article 20 of the charter fixes the liability of the parties with reference to these strandings. Wessel Duval was not made responsible for the strandings "by statute, contract, or otherwise," but "there must be fair reason to regard a vessel in peril in order to require a contribution in general average." Navigazione Generale Italiana v. Spencer Kellogg & Sons, 2 Cir., 92 F.2d 41, 43.

The Master, when questioned at the trial about danger to the vessel testified that at the first stranding, "Well, there was danger, yes. It is always dangerous when your ship is not under control;" and, that at the second stranding " * * she was in danger," and "for the same reason—the position she was in she would have blown more, in, in on the mud flats * * * the wind and sea." The log shows no greater wind than force 3 on the occasion of both the strandings.

■ While it was said in Willcox, Peck & Hughes v. American Smelting & Refining Co., D.C., 210 F. 89, 91,

"If he [the Master] finds danger in a land-locked harbor, in shallows, at anchor, or moored to a wharf, it should be no answer to register a landsman's opinion as to the necessary absence of danger at such a place";

yet, although the Rutledge aground was out of her elements and she could not be controlled, there is nothing upon which to base a finding that she was in substantial peril, either present or probable in the future.

There has been no evidence of any unusual or perilous currents, of an abnormal or dangerous tide, of adjacent rocks or reefs, of high winds or poor weather conditions, or of strain upon the structure of the vessel which might offer a threat or menace to the safety of the vessel or her cargo. I find that The Edward Rutledge on the occasion of both Cardenas strandings with proper management could have been freed by her own unaided efforts and that at no time was she or the cargo imperiled. The release of the vessel may well have been delayed until a rising tide but there is no evidence of danger—either real or substantial. The strandings of the vessel in the soft mud were mere incidents of the voyage and not events which gave rise to extraordinary common danger to the vessel or her cargo.

Although the United States is required under Art. 20 of the time charter to contribute in general average, I find nothing in the two Cardenas strandings to support a finding of a general average situation. I do not now determine whether the repairs necessitated by the Cardenas strandings were damages to the vessel beyond reasonable wear and tear.

I come now to consider the circumstances affecting the vessel while navigating through the Bahama Islands and particularly when she went aground on Hogsty Reef at 2.08 a. m. on April 15, 1948. I have noted that at the time the vessel was being navigated on the theory that Hogsty Reef Light was lighted and by use of H.O. Chart 0948 which showed the light in operation. It had in fact been discontinued the preceding July 27.

It is the contention of the Government that the vessel was unseaworthy at the time of the commencement of the voyage on which this stranding occurred and that the stranding was occasioned by this unseaworthiness. On trial it was urged that the vessel was unseaworthy in the following specific respects:

(a) Notices to Mariners 27 and 32 of 1947 were not aboard and Wessel Duval failed to use due diligence to obtain them;

(b) Pilot Charts were not aboard and Wessel Duval failed to use due diligence to obtain them;

(c) Chart 0948 used at the time of the stranding had not been brought up to date at the commencement of the voyage; shortage of personnel allowed insufficient time and opportunity to correct the chart used or the light list aboard and constituted a failure to exercise due diligence to make the vessel seaworthy;

(d) There was an incomplete complement of officers and Wessel Duval failed to use due diligence to replace the deceased Chief Mate Noll.

The Government also contends that these alleged egregious faults on the part of Wessel Duval amounted to deviation on the voyage.

I shall first consider what navigational publications The Edward Rutledge had aboard.

The Director of the Division of Marine Security of the United States Navy, Hydographic Office, gave testimony of the date of issue and contents of various navigational publications issued by the Government. Insofar as they concern these suits, these comprise Charts, Pilot Charts, Light Lists, Notices to Mariners, Sailing Directions and Daily Memoranda.

"Sailing Directions" are books treating of certain divisions of the navigable waters of the globe. They contain descriptions of the coast lines and harbors; dangers, information on winds, currents and tides, directions for approaching and entering harbors; and such other information of interest to mariners as cannot be shown on charts. They are published in 56 separate volumes, each reporting on waters within different limits. The more important corrections and additions to these volumes are published in Notices to Mariners.

"Light Lists" give detailed information of the position and character of lights with a brief description of the

lighthouses and light vessels and of accompanying fog signals.

"Notices to Mariners" are publications giving notice of change in conditions previously reported and shown on charts, light lists and sailing directions. "Daily memoranda" are mimeographed notices published prior to issuance of Notices to Mariners, giving information later reported in the Notices. In the back of each issue of the Notices is an indexed notation of corrections to the affected charts, sailing directions and light lists. A mariner keeps his charts, sailing directions and light lists up to date by noting on them the changes published in the Notices to Mariners. These Notices are issued weekly throughout the year; the 52 issues are numbered consecutively in order of publication—number 1 being issued in January and 52 in December.

Hydrographic Office "Light List and Fog Signals, No. 30, Vol. 1, January 1, 1946" covered the coasts of North and South America, the West Indies and the Hawaiian Islands. It showed under No. 3951, page 318, Hogsty Reef Light in the Bahama Islands, in operation with a height of light of 63 feet above high water and 13 nautical miles visibility. The Light List when issued contained corrections up to January 1, 1946. There were light lists issued for each year, 1944, 1945, 1946 and 1947; in 1948 the volume of corrections warranted the printing of a supplement only.

"Chart 0948" was printed by the Hydographic Office in August 1942. The chart in evidence (Gov't Ex. 4) bears the pen and ink notation "44–20" indicating that prior to distribution this chart had been hand-corrected through Notices to Mariners No. 20 of 1944.

The daily mimeographed memorandum, sheet No. 125, issued on June 28, 1947, gave preliminary notice that the Hogsty Reef Light would be discontinued around August 1, 1947. This was followed by Notices to Mariners No. 27 of July 5, 1947 in which paragraph 3353 gave notice of the proposed discontinuance of the light on or about August 1, 1947. The change was broadcast by Hydrolant "357" advising that the light had been extinguished and in the daily memorandum of the same day and this was followed by notice in the Hydographic Bulletin of August 2, 1947. Notice to Mariners No. 32, dated August 9, 1947, again noted in paragraph 4030 that Hogsty Reef Light had been discontinued and the structure abandoned. Both Notices to Mariners Nos. 27 and 32 contained check reference notes of the change which should be made on several H.O. charts, including chart 0948.

A free mailing list is maintained by the Hydographic Office for Notices to Mariners and any master or shipping company can be placed on the list to receive these notices. Neither The Edward Rutledge nor Wessel Duval or its agents at Mobile, Santiago, Havana or New York were on this list.

Notices to Mariners 27 and 32 were readily available at all times that the vessel touched Mobile or Pensacola prior to departure for Cardenas except that Notice 32 may not have been available at Mobile when the vessel sailed from that port August 13, 1947.

The 1947 Pilot Charts were aboard. The vessel sailed from Mobile on January 17, 1948. There is no evidence that later Pilot Charts were available at the time of departure. Pilot Charts are issued monthly; the data shown with respect to currents did not change materially in the Hogsty Reef area; the later 1948 Pilot Charts were no more complete in this respect than were those for 1947.

The latest published Light List No. 30 aboard The Edward Rutledge was the 1946 issue; in fact there were two copies of this one aboard. No new Light List No. 30 was published for 1948; the last published before departure from Mobile was the 1947 List which contained corrections only up to January, 1947. There was, however, published a 1948 Supplement to the 1947 List which corrected it up to January, 1948. This supplement did not come out until February, 1948 and was not available for distribution by the H.O. office until March, 1948.

The Master of The Edward Rutledge had been to sea since 1911 and had held a master's license since January, 1921. He was Master of The Rutledge from June, 1947 to July, 1948. He joined the vessel at New Orleans, signed on the crew and made her ready for sea. On his first voyage as Master the vessel proceded from New Orleans to Pensacola, loaded coal, discharged it in Sicily, returned with water ballast to Ceuta for fuel and then went to Mobile, where she arrived in August, 1947. There, at Mobile an "armful" of Notices to Mariners was obtained for the vessel by the Third Mate, Hermey. Again, a cargo of coal was loaded aboard and after a week in port the vessel sailed for Savona, Italy, where she discharged her cargo and returned to Mobile, stopping at Ceuta for fuel. She left Mobile, loaded a cargo of coal at Pensacola for France, delivered the cargo and returned to Mobile, arriving there about January 7, 1948. The Edward Rutledge then left Mobile on January 17, 1948 for Cardenas, Cuba, where she took on the cargo of sugar which was eventually discharged at Bremerhaven. There the vessel encountered a dense and protracted fog, and she did not sail until March 4, 1948.

A conflict of testimony is presented as to whether Notices to Mariners 27 and 32 were aboard when she left Cardenas and at the time of the Hogsty Reef stranding.

None of the officers on The Edward Rutledge knew of the discontinuance of Hogsty Reef Light, but from this it does not necessarily follow that Notices to Mariners 27 and 32 were not aboard. The evidence supports a finding to the contrary.

The Master testified that these notices were aboard in April, 1948 when the voyage began and that he was positive of this, for he testified that on two prior voyages he had had occasion to consult a light list in which were pasted corrections which had been published in these two Notices. He testified that in about November, 1947—5 months before the stranding—while in heavy seas in the

Bay of Biscay, about to enter St. Nazaire, he had to fix his position by the light Pointe de Dames on the Ile de Noirmoutier (called by him the "French" light). He knew that the colors of the light had been changed and to ascertain what change had been made he first consulted Light List No. 32, Vol. III, Item 440. He found that the light had been changed to red, white and green; this correction was published as Item 4072 in Notice to Mariners 32 of 1947. On the second occasion the Master remembered having consulted Light List Vol. IV, No. 33; this was in February or March, 1948 shortly before the stranding. The ship was returning from Bremen, Germany en route to Havana; she was coming out of the Weser River and to head into the English Channel she had to set her course by Smiths Knoll Light Vessel. He particularly recalled this voyage because it was foggy weather and it was necessary to "run over" the gaslit buoys in order to count them, as they had been extinguished by the mist. To head into the Channel at the last buoy he had to sight the light vessel; and this he did by consulting Light List No. 33. Pasted in it was notice of a proposed correction, which was published as Item 3386 in Notice to Mariners 27 of 1947. This incident was fixed in the Master's memory because this was the first time he had had occasion to use the new radio beacon in the Channel—the proposed establishment of which was reported in this Notice.

The Master also testified that while the vessel was at Mobile in August, 1947 Hermey, the third mate, had obtained an armful of Notices to Mariners; that in October, 1947 Second Officer Beard, at Mobile, had brought a number aboard; and that in January, 1948, prior to the vessel's departure from Mobile a requisition had gone out to the Agents for a 1947 or 1948 Light List and that neither was available there. It has been stipulated that Notices to Mariners 27 and 32 were available at that port at those times. The latest light list aboard was the 1946 edition. The Master testified

that shortly before the stranding he consulted the 1946 Light List and saw various clippings pasted in it; that it was no part of his duty to consult the Notices to Mariners or to keep the Lists corrected up to date and that he did not check them against corrections. He testified that the notices were kept in a drawer and locker in the chartroom.

The Government points to the fact that notice that the change had actually been made to Smiths Knoll Light Vessel was contained in a later edition of Notices to Mariners No. 30 of 1947, which contained no reference to Hogsty Reef Light. The Master testified, however, that the notice he saw was of the proposed change of the Light Vessel; this was in Notices to Mariners 27. It is not contended by the Government that the notice of the proposed change was repeated in the later Notice.

Although third mate Hermey, who later was acting Chief Mate, testified that he did not see the pertinent notices to mariners in the chartroom and never saw any added to the bundle in the locker in the chartroom after he joined the vessel in June, 1947, he also testified that it was no part of his duty to obtain or correct publications, and that not being in the chartroom while on duty he would not know whether notices in fact were added. It should also be noted that his service aboard the ship was not continuous; he did not serve on her from October 7, 1947 to January 7, 1948. He did recall seeing notices in the locker, but he had not the slightest idea of their number or their year; he, himself, did not deny the testimony of the Master that in August, 1947 he brought a large number of notices aboard. The receipt Noll signed substantiates the Master's testimony. Hermey's testimony concerning the search he made of the chartroom with second mate Murray after the stranding for the notices is extremely vague; the search was cursory; he did not look in the locker and he did not know for what notices he was looking either by their number or year.

We have had only the deposition of second mate Murray; he was the navigation officer and charged with the task of obtaining and keeping navigational publications up to date. It was his duty after the Master advised him of the intended course of the vessel to check and provide the charts, light lists, sailing directions and navigational aids needed, and to make up a list of the necessary publications not aboard so that they might be requisitioned from the agents. Such a requisition was made in Mobile, on January 14, 1948 (Govt's Ex. 5), requesting, among other things, Pilot Charts, Notices to Mariners and Light Lists for 1947 or 1948. Purchase orders from the Chandlery Office (Govt's Exs. 6–A and 6–B, dated January 16 and January 14, 1948) were receipted for by both Hermey and Noll (the deceased mate) respectively. The purchase order of January 14 contains a notation that all the publications listed (among which were Notices to Mariners) are the latest editions, with supplements, and that Nos. 30, 32 and 35 of the requested 1947 or 1948 light lists were out of stock. Although Murray testified that there were no notices aboard reporting on the discontinuance of Hogsty Reef Light and that he had not been able to obtain some of the Notices he had requisitioned, he was unable to specify what these were. Indeed, the receipted order does not indicate that any of the Notices requisitioned were not supplied; significantly, it does specify which of the light lists requisitioned were not furnished! Murray further testified that from 8 to 12 Notices to Mariners were received aboard in January, 1948, and that among these there probably were included some 1947 and 1946 Notices, for on that date at most only two 1948 Notices would have been published. The latest light list then published was the one for 1947 which would contain corrections only up to January, 1947, and to bring it up to date it was necessary to have, in addition, all Notices to Mariners published subsequent to January, 1947. Without a properly corrected light list it was impossible to check

the lights on the navigation chart in use for the particular area being travelled. Murray, in his testimony, recognized that it was his duty as navigation officer to keep the charts and navigation aids current and up to date, and that this work was to be done while in port, and if not then while at sea, but in either case prior to reaching the lights of the particular area. When looking for the Notices after the stranding and concerning the "search" conducted by Hermey and him, Murray testified that they looked in the chartroom table but that he did not recall looking in the locker. He also testified that in January, 1948 on the vessel's first trip to Havana, he had asked the Master to purchase the latest publications but had been unable to obtain them there as he did not know of any H.O. agents in that port. He could not remember whether any Notices to Mariners came aboard between January and May, 1948, even though he was in a position to know if they had, nor could he recall whether he received any Notices while in Bremerhaven and Southampton in February or March, 1948. He did remember obtaining one Notice at Santiago when the vessel was loading for the voyage, although he could not recall which Notice it was, and, strange for a navigation officer, he testified that he did not know that consular offices at all ports are required to post Notices to Mariners.

The testimony of Murray must be appraised in the light of his admission that it was his duty to cut the relevant corrections from the Notices to Mariners and paste them in the publications for navigation used and to keep the charts current. He also recognized that his neglect to do this, would reveal him as delinquent if not incompetent as a navigation officer and would subject him to possible disciplining by the Coast Guard and perhaps, even, temporary suspension of his license.

Howard F. Beard, who was the Second Mate on the vessel, from August 13, 1947 when he joined at Mobile to October, 1947, testified in his deposition that no Notices to Mariners were missing and that he would have noticed had any been missing since they are published throughout the year in numerical order. He recalled that on a trip coming back from Savona and going into Ceuta—an area with which he was unfamiliar—the vessel ran into a dense fog on September 15 and 16, 1947, and he felt that because of his unfamiliarity with these waters he would have checked the light lists and brought them up to date.

The fact that in February, 1949, when suit was imminent, the pertinent Notices to Mariners could not be found aboard the vessel is too remote to support an inference that they were not aboard at the time of the stranding; ten months had elapsed since the stranding and by February, 1949 Notices to Mariners 27 and 32 of 1947 would have become obsolete and probably had been discarded.

██ I find that the testimony clearly warrants a finding that Notices to Mariners 27 and 32 of 1947 were aboard at the time of the stranding, and that the 1946 Light List in use had not been brought up to date with the corrections published in these Notices. Finally, it should be noted that these Notices were available to anyone who might ask for them six to ten days after publication dates, that they were kept on supply for six months or more, and that The Edward Rutledge from August 5, 1947 to January 17, 1948 was three times in the port of Mobile and once in Pensacola, where Notices to Mariners were readily available.

We come now to the Government's contention that an additional cause of the stranding was the failure to have pilot charts aboard and the lack of due diligence to obtain them—a failure which it maintains resulted in rendering the vessel unseaworthy.

Although there is no dispute that pilot charts are not to be used for navigation purposes, they are aids to navigation in that they show currents, winds and weather conditions. They are issued monthly, but from year to year within a given month they vary little, and it is

conceded that an April, 1940 chart would be as accurate as one for April, 1948.

Both the Master and Murray (the Government's witness) testified that 1947 charts were aboard the Rutledge at the time she stranded. The Government points, as evidence that they were not aboard, to (1) the testimony of the Master that he experienced no current in the "area" of Hogsty Reef and that none was shown on the chart, while the charts do show a current to the northwest; and (2) the requisition by the Master at Mobile on January 14, 1948 for 1948 charts, when he well knew that the later charts would not differ from those for 1947. Neither contention carries much weight. In the first place, the testimony of the Master concerning the current was limited to the immediate vicinity of Hogsty Reef, and Pilot Chart for 1947 (Govt's Ex. 28), although it does show a northwest current between Cape Maysi and Great Inagua, south of Hogsty Reef, shows no current for Hogsty Reef, and the Sailing Directions (Ex. 32) which it is not claimed were not aboard and which the Master testified he consulted show variable currents "very irregular, both as to direction and strength" at Hogsty Reef. In the second place, the requisition by the Master at Mobile included all latest publications and is in no way indicative of the fact that the 1947 Pilot Charts were not aboard. The requisition of a later Pilot Chart may be further explained by reason of the fact that although current data in the charts does not vary, wind and weather conditions do, from year to year.

█ Even assuming that the 1947 Charts were not aboard (which the evidence belies) The Edward Rutledge would not thereby have been rendered unseaworthy, since she did have Sailing Directions providing the necessary current information to permit safe navigation of the vessel. Middleton & Co. (Canada), Ltd. v. Ocean Dominion S. S. Corp., 2 Cir., 137 F.2d 619; The Temple Bar, 4 Cir., 137 F.2d 293.

█ █ I find from the uncontroverted evidence that 1947 Pilot Charts were aboard; failure to use them would at most amount to an error in navigation, not unseaworthiness. Middleton case, supra; The Havana, D.C., 45 F.Supp. 244.

Section 223, 46 U.S.C.A., and the certificate of inspection of The Edward Rutledge required a deck complement of three licensed mates in addition to the Master. The certificate of inspection issued by the United States Coast Guard provided that the vessel carry a complement of licensed deck officers consisting of a Master, Chief Mate, Second Mate, and Third Mate. When The Edward Rutledge left Santiago she had only two mates.

When Chief Mate Noll died shortly after 8 p. m. on Saturday, April 10, 1948, and before the vessel left Santiago for Kingston at 1.47 a. m., April 11, the Master asked the consul and the agent to assist him in obtaining a replacement for the dead mate. Both informed the Master that there were no replacements in Cuba.

Before leaving Santiago the Master promoted Third Mate Hermey to Chief Mate. Hermey had joined the vessel in June, 1947; he had made the first two voyages and in the following October had left the ship at Mobile and later rejoined her in January, 1948. He had been granted a second mate's license in 1925, a mate's license in 1928, and a master's license in 1942; he was experienced and qualified to be chief mate. Murray, the Second Mate, was kept in that position; he had held a second mate's license since February, 1946, and had joined the vessel at Mobile on January 16, 1948 and signed off in New York on July 6, 1948.

The Master considered the vessel sufficiently manned for the voyage to Kingston. His judgment was correct for the vessel safely made that trip. At Kingston, the Master took the ship's papers to the consul and entered and cleared her. At that time he again endeavored to obtain a replacement by inquiry of the consul and of the Kingston agent, and again was unsuccessful. The vessel had two extra men aboard, over and above cer-

tificate requirements—a boatswain and deck maintenance man. The Master planned to later use one of the crew as a third mate; leaving Kingston, the Master arranged that the Chief and Second Mates were to stand their regular watches and that he would stand that of the Third Mate. He considered the vessel sufficiently manned for the voyage to Germany when she left Kingston. The Master, himself, was in charge of the navigation after leaving Kingston and he laid out the course on the chart which was being used at the time the vessel went aground on Hogsty Reef.

It is undisputed that Chart 0948 was in use after they left Kingston. She stranded on the reef approximately thirty-six hours after her second departure. I find that Chart 0948 first came into use at 9 p. m. on April 12, 1948 when the vessel left Kingston.

The course of the vessel through the Bahama Islands took her into "close waters"—inland waters with land on both sides—and through an area recognized by the Master to be so dangerous as to require constant alertness on his part. He took over direct supervision of the navigation; at all times he was either on the bridge or immediately available to call.

The Chief Mate customarily stood the 4–8 sea watches; the Second Mate the 12–4, and the Third Mate the 8–12; the Master stood the 8–12 watch after they left Kingston. Murray had come on watch at midnight and relieved the Master who was standing the Third Mate's watch.

When Murray took over the watch the Master instructed him to call him when he first picked up Hogsty Reef Light, or if he did not pick it up by one o'clock to call him then. The course of the vessel had been changed at 11.30 p. m. to 045 degrees gyro; it was a dark, clear night; the moon was obscured by clouds, the sea was moderate and the wind force around 4 to 5. At one o'clock the light had not been sighted; the Master advised of this instructed Murray to call him when the light was sighted, and if not sighted by 1.30 to again call him.

Again at 1.30 report was made to the Master that it had not been sighted, and he then joined the Second Mate and the lookout on the flying bridge. At 1.54, April 15, the vessel changed her course to 005 degrees gyro. This change was made at the order of the Master who had taken over direct supervision of the navigation. At 2 a. m. the Master went to the chart room to check the course; he was there when the ship stranded at 2.08. At that time, Murray was still on watch, and First Mate Hermey was asleep in his bunk. If a Third Mate had been on board he would not have been on duty at the time of the stranding; his watch, which the Master stood would have ended two hours earlier. It cannot be said that at the time of the stranding the vessel was being navigated by inexperienced, unqualified or incompetent officers. That there was no Third Mate aboard was not "an operating factor at the moment the ship struck." The Iowa, D.C., 34 F.Supp. 843, 848.

▄▄▄▄ The Edward Rutledge was guilty of statutory fault in starting and continuing the voyage without having obtained a full complement of officers. The burden is on the vessel to establish "not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been" one of the causes of the stranding. The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148, 151. While the rule so enunciated has been stated as one which in effect penalizes the violator by reason of the extreme difficulty, if not impossibility, of showing that the violation could not have contributed to the accident, (The Princess Sophia, 9 Cir., 61 F.2d 339), the "history of its application shows that it has done no more than shift the burden of proof with regard to causality." The Aakre, 2 Cir., 122 F.2d 469, 474, certiorari denied, Waterman v. The Aakre, 314 U.S. 690, 62 S.Ct. 360, 86 L.Ed. 552. In the presence of statutory fault a presumption arises that such fault contributed to the disaster—be it collision or stranding —and the burden is then placed on the

vessel to establish that there was no causal connection between the two, that is, that the violation was not an "operating factor." Since the rule of The Pennsylvania, supra, has been interpreted to be one of procedure, the court in applying it is "limited to the reasonable probabilities." The Mabel, 2 Cir., 35 F.2d 731, 732.

Although the Pennsylvania case involved a collision and its most frequent application has been to such cases, it is also applicable to stranding cases. The Aakre, supra; The Denali, 9 Cir., 112 F. 2d 952 (the very point specifically passed upon by the court on rehearing); Richelieu & Ontario Nav. Co. v. Boston Marine Ins. Co., 136 U.S. 408, 10 S.Ct. 934, 34 L.Ed. 398.

Consequently, it is incumbent on Wessel Duval to establish that the particular act or omission which led to the stranding of The Edward Rutledge was not that she sailed without the Third Mate as required by statute, and this I find it has done.

While it is argued that the necessity for the Master's standing the 8–12 watch in place of the Third Mate cast an additional burden on him which might have affected his judgment in navigation, I find that this played no part in occasioning the stranding. At the time the Master was standing the watch, the vessel was traveling in "close waters", and, in any event, his presence on the bridge would have been dictated by prudence. When the vessel stranded at 2.08, Second Mate Murray was on watch and the Third Mate's watch would have ended; "if he had been on board he might well have been asleep, and he certainly had no duty to perform." The North Star, 2 Cir., 255 F. 955, 956. This is certainly not comparable to the situation in New York Marine No. 10, 2 Cir., 109 F.2d 564, 566, where the court finding that the vessel had not met the burden of establishing that the shortage of a deckhand had not contributed to the collision, concluded that it was "impossible to say that the other deckhand might not have been on duty * * * on the morning of the collision, had there been two deckhands on board." There, too, the deckhand who was on board, was found to be incompetent. No such contention is here made and none could be sustained since it cannot be argued that the experienced Master of the Edward Rutledge was not more competent than any replacement would have been. The Denali, supra, is not to the contrary. In that action the court found that the violation of the statute governing the number of mates and the standing of 12-hour watches at 6-hour stretches in contravention of the prescribed hours was customary on the ship, that this was done with the owner's knowledge and assent, if not at his direction, and that at the time of the stranding, the navigating mate had not only been on watch for 12 hours, but that he was being assisted by an incompetent third mate in navigating extremely dangerous waters. It was there concluded that the vessel was wrecked by the fault of the two mates who had been standing excessive watches in violation of the statute, and that the owner had not discharged the burden of showing that this had not contributed to the stranding. Here, although Hermey and Murray were compelled to stand extra watches on the run from Santiago to Kingston (April 11–12), and between the first and second departures from Kingston (April 12–13), these amounted to no more than 7 extra hours over two and a half days and were well before the vessel stranded on April 15—four days later. There was sufficient time for Murray to correct the charts and light lists notwithstanding the watches he stood; the fact that Hermey and the Master undertook additional watches would have no bearing on Murray's ability to correct the publications— since this was exclusively his duty.

In Lind v. United States, 2 Cir., 156 F.2d 231, it was held that although the vessel was guilty of statutory fault in failing to have proper lights and a lookout, the vessel would be liable only if it were shown that the failure of lights misled or could have misled the other vessel, and if the presence of a lookout could

have changed the navigation which ultimately resulted in the collision. Cf. Ulster Oil Transport Corp. v. The Matton No. 20 (Petroleum No. 7), D.C., 109 F. Supp. 581, affirmed, 2 Cir., 210 F.2d 106. Similarly, in Southern Pac. Co. v. United States, 2 Cir., 72 F.2d 212, it was held that the vessel had sustained the burden of disproving contributory fault when it was shown that although it was lacking a first assistant engineer, at the time of collision the Chief Engineer was at his post—where he should have been.

I find that the violation by Wessel Duval of the statutory requirement that there be three licensed mates aboard in no way contributed to the stranding of the Edward Rutledge on the morning of April 15. It is apparent that observance of the statute by the presence of a third mate aboard would not have averted the disaster; in such case "the nonobservance of such rule becomes immaterial." The Umbria, 166 U.S. 404, 17 S.Ct. 610, 616, 41 L.Ed. 1053, 1061.

In view of this conclusion it is unnecessary to decide whether failure to have a full complement of officers aboard amounted to unseaworthiness or to an error in navigation or management.

■ It is undisputed that neither Chart 0948 nor the 1946 Light List had been brought up to date with corrections from Notices to Mariners 27 and 32. I have found that these Notices were aboard; whether failure to note the corrections reported in them was occasioned because, as the Government maintains, they were inaccessible or there was insufficient time to make the corrections before reaching Hogsty Reef Light constituted unseaworthiness is the question presented. While in complete agreement with the general rule that failure to use navigational data aboard constitutes error in management or navigation, rather than unseaworthiness, the Government contends that the facts here present an exception to the rule.

■ In support of its position that there was insufficient time to correct the publications the Government points to the testimony of the Master that Chart 0948 was put into use immediately after the Edward Rutledge left Kingston on April 12, at 9 p. m. and that there was a shortage of a mate; this latter contention I have held to be without weight; as to the former, the vessel did not reach Hogsty Reef area until two days later,— affording ample time to make the necessary corrections, both on the Chart and the Light List. With respect to the claim of inaccessibility of the notices there is no evidence to support such a finding. Finally, it urges that there was no possibility for correction of the Chart and Light List since both the Master and the mates believed that they were accurate and required no correction. The analogy to the open porthole cases drawn by the Government and the cases it relies on to support its position that those in charge must know that the publications are not correct are distinguishable.

In The W. W. Bruce, 2 Cir., 94 F.2d 834, 836, it was held that the vessel had not established that it was seaworthy because it had failed to prove that the required notice giving the new numbers of certain buoys was aboard—"the vital issue of fact." For, "if it [the notice] were, then the failure to correct the numbering of the buoys on the chart might be evidence of a fault in navigation or management rather than unseaworthiness", citing U. S. Steel Products Co. v. American & Foreign Ins. Co., 2 Cir., 82 F.2d 752. On rehearing, supra, 94 F.2d 838, the court adhered to its finding of unseaworthiness, not because as the Government says it required "accessibility" of the notice, but because it found that "the means for immediate correction of the chart were not ready at hand", and that "to make the corrections would require investigation of material other than the chart and the notice, the deducing of conclusions not directly stated in any of the documents examined, and the piecing together of the information so obtained."

This is not the situation here where all the information was contained in but two Notices to Mariners in the back of

which the corrections were arranged and indexed according to the light lists and chart affected.

In U. S. Steel Products Co. v. American & Foreign Ins. Co., supra, the question of whether the charts and light lists should be corrected before the voyage began was expressly passed upon, Judge Hand answering that "it need not have been if before the ship reached the waters which the charts and the lists covered they could conveniently be brought up to date; if that was not done, it was due to the negligence of the crew during the voyage, not to faulty equipment, and the ship was not unseaworthy. An exception need be made only as to waters that the ship must enter at once or too soon for the necessary correction." 82 F.2d at page 753. This is the exception which the Government urges is applicable to the Edward Rutledge. But I have found to the contrary, that more than sufficient time elapsed from the beginning of the voyage until the Hogsty Reef area was reached to permit of corrections, and the exception is therefore inapplicable.

The other contention of the Government that lack of knowledge on the part of the officers that the chart and Light List needed correcting was a failure of the exercise of due diligence in the use of the Notices before the commencement of the voyage rendering the vessel unseaworthy is disposed of in, what is perhaps the leading case in this Circuit on the question of seaworthiness and navigational data,—Middleton & Co. (Canada), Ltd. v. Ocean D. S. S. Corp., 2 Cir., 137 F.2d 619. There, the vessel stranded as the result of having gotten out of her course when her master mistook a wreck for a vessel under way. The chart by which the ship was being navigated had not been corrected to show changes from two Notices to Mariners which were on board and which showed the location of the wreck, nor had the master or mate examined the H.O. Notices at the Custom House, which gave warning of the wreck and its location. They had not done so, the court found "because after procuring Chart No. 360 they assumed it was correct to date, in spite of the fact that it showed on its face that it was not." 137 F.2d at pages 620–621. Had it been brought up to date the accident probably would not have occurred. In affirming the trial judge that the vessel was seaworthy and that the loss resulted from "an act, neglect, or default in the navigation or management of the ship for which there was no liability on the part of the carrier or the ship", the court wrote, 137 F.2d at page 622:

"We hold that the *Iristo* was properly found seaworthy because of the notices on board which disclosed the existence and location of the wreck and that the failure to bring the chart up to date, or otherwise to use the information available, when navigating in the vicinity of Bermuda, was a fault 'in navigation or management.' This very point was involved and passed upon by the present court in U. S. Steel Products Co. v. American & Foreign Ins. Co., 2 Cir., 82 F.2d 752. There the 'Steel Scientist' was found seaworthy, in spite of the fact that her charts had not been brought up to date, because there were records on board from which they could be readily corrected before the vessel reached the waters in which the information became necessary for proper navigation. It would seem equally foolish to hold a ship unseaworthy because her master employed a chart that had not been brought up to date, when he had a correct chart on board that he had forgotten to use, and to hold the *Iristo* unseaworthy because her officers employed a deficient chart when the means to correct it in good season were available."

Judge A. Hand then distinguished cases where the ships were of a dangerous and unusual construction and the crew ignorant thereof, and noted that such was the situation in The Elkton, 2 Cir., 49 F.2d 700, where it was said that " 'seaworthiness may depend upon the knowledge of

the ship's company as to how far she has been in fact made ready' ". In conclusion, Judge Hand in the Iristo said:

"We know of no decision where the neglect of the ship's officers to perform the routine labor of examining mariners' notices so as to bring navigation charts up to date and make them safe for navigation has been imputed to the owner. The data for navigation of the *Iristo* was adequate and the vessel seaworthy."

 I conclude that the failure on the part of the officers of the Edward Rutledge to correct Chart 0948 and Light List 1946 from Notices to Mariners 27 and 32 which were aboard and readily available was an error in navigation or management occasioned solely by the negligence of the crew and in no way affecting the seaworthiness of the vessel.

The "Fringe" Claims

I now come to a consideration of the applicability of Article 24 of the Time Charters (The Disputes Clause) to the various claims and counterclaims asserted by the parties to this litigation.

It has already been noted that Judge Dimock determined prior to trial that the claim for cargo loss or damage proffered by the Government is barred by the provisions of the time charters which incorporated the one year limitation of the Carriage of Goods by Sea Act; and that Wessel Duval may not have affirmative recovery on the claims asserted by it in libels A.169–342 and A.172–156.

The general average claims of Wessel Duval arising out of the Hogsty Reef and Cardenas strandings have been determined by this trial. This has been done as specifically provided for by Article 19; these claims do not fall within the provisions of Article 24. The dismissal of the claim of the United States under Article 12 (The Off-Hire Clause) arising out of the Hogsty Reef stranding pleaded in the first cause of action in A.169–342 follows from the findings favorable to Wessel Duval on its general average claim arising from this stranding.

In view of Judge Dimock's rulings and the findings and conclusions here made it becomes unnecessary to determine the contention of Wessel Duval that the United States has waived the provisions of the Disputes Clause by filing a libel seeking affirmative relief under the time charter, or that the benefit of these provisions has been lost by reason of inaction and failure of decision on the part of the administrative officer designated by this clause. The United States has consistently contended that the Disputes Clause applies to all claims excepting those arising out of the strandings. The claim of the United States for removal of sand ballast comes within the Disputes Clause; I do not pass upon the merits of it.

Let appropriate decrees be submitted on notice providing for the entry of judgment in accordance herewith.